# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-01-00074-CV

**Henrietta Flores, Appellant**

v.

**Employees Retirement System of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT
### NO. GN001862, HONORABLE JOHN K. DIETZ, JUDGE PRESIDING

Appellant Henrietta Flores appeals the district court's order affirming a final order by
the Board of Trustees for the Employees Retirement System of Texas (the Board) denying her
application for occupational disability benefits.[1]  She raises two issues in her appeal, alleging (1) that
the Board's action was arbitrary and capricious or that it abused its discretion because the Board
applied a new policy in the course of Ms. Flores's contested case without giving her notice of its
intent to do so; and (2) that the Board's interpretation of the statutory definition of occupational

---

[1]  We will refer to several entities throughout this appeal.  The "Board" refers to the agency's
board of trustees, which hears appeals of contested cases.  *See* Tex. Gov't Code Ann. § 815.511
(West Supp. 2002).  The "Medical Board" refers to the agency's medical board, which certifies
occupational disability retirement claimants as disabled.  *See id.* § 814.203 (West 1994) (providing
that the medical board shall issue a certification of disability if it "finds that the member is mentally
or physically incapacitated for the further performance of duty, that the incapacity is likely to be
permanent, and that the member should be retired").  We will refer to "ERS staff" to mean the
agency's representatives at the administrative hearing before the State Office of Administrative
Hearings.

disability is inconsistent with the plain language of the statute. As we sustain both of Ms. Flores's issues, we will reverse the judgment of the trial court and the order of the Board.

## FACTUAL BACKGROUND

Ms. Flores worked for almost fifteen years as an aide to social workers, first at the county level and later for the Texas Department of Protective and Regulatory Services (the Department). As an aide, her primary job function was to transport the children who had been removed from their homes by the Department to court hearings, doctors' appointments, and to their homes for visits. She provided transportation mostly in the Austin and central Texas area, but occasionally drove as far as Dallas and Houston. Ms. Flores drove roughly seventy-five percent of the day and spent between seven to twelve hours each day in the car.

While driving two small children from their home to the Department, she was severely injured in a car accident. A mattress suddenly fell off a truck in front of her, causing her to swerve and brake; unfortunately she could not avoid the mattress, which lodged under her car. Ms. Flores believed her knee hit the steering wheel upon impact, and within a few hours she experienced extreme pain in her back that radiated down her leg. Several days later she also began to suffer pain in her knee. After a few days, Ms. Flores returned to work but experienced increasing pain. Although she underwent two surgical operations and physical therapy, she could not resume her duties at the Department. Doctor Albert Molnar specifically evaluated her disability in the context of her job as a social services aide and found that she could no longer drive as before, lift pediatric clients, or move quickly enough to restrain the children. The Board concedes that Ms. Flores is permanently disabled.

Ms. Flores, who had consistently received excellent evaluations by her supervisors at the Department and had had no difficulty in the performance of her job duties before the accident, was dismissed.

After her dismissal, Ms. Flores applied for occupational disability retirement benefits from the Employees Retirement System (ERS),[2] which was created by the legislature for the purpose of providing a retirement system for aged and incapacitated state employees. *See* Act of May 27, 1947, 50th Leg., R.S., ch. 352, 1947 Gen. Laws 697, 697 (statement of purpose).[3] Ms. Flores's claim was denied on the ground that her disability did not meet the statutory definition of an occupational disability.

Ms. Flores's application for retirement benefits is governed by section 811.001(12) of the Government Code, which defines occupational disability to mean a disability "from an injury or disease that directly results from a specific act or occurrence determinable by a definite time and place, and directly results from a risk or a hazard peculiar to and inherent in a duty that arises from and in the course of state employment." Tex. Gov't Code Ann. § 811.001(12) (West Supp. 2002).[4] ERS denied Ms. Flores's claim, finding that her disability failed to satisfy either statutory prong. She

---

[2] The Employees Retirement System's (ERS's) governing statute, which is subtitled "Employees Retirement System of Texas" is found at sections 811.001-815.512 of the Government Code. *See* Tex. Gov't Code Ann. §§ 811.001-815.512 (West 1994 & Supp. 2002).

[3] ERS provides four types of benefits for eligible state employees: service retirement, occupational disability retirement, nonoccupational disability retirement, and death benefits. *See* Tex. Gov't Code Ann. § 814.001 (West 1994).

[4] Ms. Flores's appeal was pending before September 1, 2001 and is governed by the law in effect at that time. An amendment to Section 811.001(12) became effective on September 1, 2001. *See* Act of May 23, 2001, 77th Leg., R.S., ch. 1231, § 1, 2001 Tex. Gen. Laws 2827, 2827. It is presumed that statutes operate prospectively unless expressly made retrospective. Tex. Gov't Code Ann. § 311.022 (West 1998). As the amendment that became effective September 1, 2001 has no substantive effect on the definition, however, the current code is cited for the sake of convenience.

appealed, and after an administrative hearing, the administrative law judge (ALJ) found that Ms. Flores's application satisfied both requirements and recommended that occupational disability benefits be awarded. The Board reversed the ALJ's findings of fact and conclusions of law[5] as to both statutory prongs and denied benefits. This appeal hinges on our review of the Board's interpretation of section 811.001(12).[6] Ms. Flores, however, has also challenged the manner in which the Board decided her appeal: Ms. Flores contends that the manner in which the Board decided her case is "an affront to the decision-making process prescribed by [the Administrative Procedure Act (APA)]." We turn first to Ms. Flores's argument that the Board acted arbitrarily and capriciously in denying her appeal.

**ARBITRARY & CAPRICIOUS**

In her first issue, Ms. Flores argues that the Board's action was arbitrary and capricious or constituted an abuse of discretion under section 2001.174(2)(F) of the APA. *See* Tex. Gov't Code Ann. § 2001.174(2)(F) (West 2000).[7] Ms. Flores argues that in denying her claim, the

---

[5] *See* Tex. Gov't Code Ann. § 815.511(a) (West Supp. 2002) (authorizing the Board to change or delete findings of fact and conclusions of law contained in a proposal for decision submitted by an administrative law judge or other hearing examiner and to make alternative findings of fact and conclusions of law, and requiring Board to state in writing its specific reasons for the changes); 34 Tex. Admin. Code § 67.91(b) (2001) (Employees Ret. Sys., Hearings on Disputed Claims) (requiring written explanation for any change and providing criteria for authorized changes).

[6] *See* Tex. Gov't Code Ann. § 2001.174(2)(A), (D) (West 2000) (providing that a reviewing court shall reverse or remand the case "if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions" violate a statutory provision or are affected by other error of law).

[7] The section mandates that a reviewing court reverse or remand a case "if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are . . . arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." Tex. Gov't Code Ann. § 2001.174(2)(F) (West 2000).

4

Board ignored its own precedent holding that a preexisting condition that is caused solely by the natural aging process and is asymptomatic until aggravated by a traumatic incident does not prevent one from receiving occupational disability benefits. She also contends that the Board applied a new policy in the course of her contested case hearing without providing her notice, before the hearing, of its intent to do so. *See Texas State Bd. of Pharmacy v. Seely*, 764 S.W.2d 806, 815 (Tex. App.—Austin 1988, writ denied)*, and *Madden v. Texas Bd. of Chiropractic Exam'rs*, 663 S.W.2d 622, 625-27 (Tex. App.—Austin 1983, writ ref'd n.r.e.). The Board disagrees, asserting that the previous decisions on which Ms. Flores relies do not constitute binding precedent.

The issues raised by Ms. Flores implicate a broader question as to the manner in which the Board decided her appeal. After hearing all of the evidence at the contested-case hearing, the ALJ decided in Ms. Flores's favor. The minutes of the Board's meeting, of which we take judicial notice, reflect that immediately after hearing from both sides and without any deliberation, the Board declined to adopt the ALJ's recommendation and unanimously voted to deny Ms. Flores's appeal. After announcing its decision, the Board also ordered its general counsel to make new findings of fact and conclusions of law. The general counsel's findings of fact and conclusions of law, which made systematic and widespread changes and additions to the ALJ's findings of fact and conclusions of law, were later adopted by the Board. The Board's changes to particular facts suggest that the Board was acting as its own fact-finder despite having delegated that duty to the ALJ. *See Montgomery Indep. Sch. Dist. v. Davis*, 34 S.W.3d 559, 564 (Tex. 2000) ("having chosen to delegate the fact-finding role to the hearing examiner, a board cannot then ignore those findings with which it disagrees and substitute its own additional findings."). In addition, the Board failed to comply with its statutory

5

authorization and administrative rules, which enable the Board to make changes but also place limits on its ability to do so. *See* Tex. Gov't Code Ann. § 815.511(a) (West Supp. 2002); 34 Tex. Admin. Code § 67.91(b) (2001) ("Rule 67.91(b)").

These aspects of the Board's manner of deciding Ms. Flores's appeal raise serious due process concerns. We recognize that an agency does not operate under the same rules as a court of law, nor is it subject to the same restrictions. An agency must, however, respect the due-process rights of applicants who appear before it in contested cases. *See Seely*, 764 S.W.2d at 815 (holding that an agency denied a party a meaningful hearing required by due process); *Madden*, 663 S.W.2d at 625-27 (holding that an agency violated procedural due-process rights of a party by failing to give him notice of new statutory interpretation that agency applied for first time in the course of claimant's hearing). Because of the seriousness of the issues raised by the Board's treatment of Ms. Flores's appeal, we will address each issue separately.

### Board as Fact-Finder

Procedural due process does not apply to every action the government or an administrative agency takes, but it does apply when "government deprives an individual of 'life, liberty, or property' based on resolution of contested factual issues concerning that individual." 2 Kenneth Culp Davis & Richard J. Pierce, Jr., *Administrative Law Treatise* § 9.2 at 3 (3d ed. 1994). When the agency's decision has such an individualized effect, the agency is obligated to provide some type of adjudicative hearing. Professor Davis has explained that such a hearing requires the resolution of two different types of facts: adjudicative and legislative:

6

> Adjudicative facts usually answer the questions of who did what, where, when, how, why, with what motive or intent; adjudicative facts are roughly the kind of facts that go to a jury in a jury case. Legislative facts do not usually concern the immediate parties but are the general facts that help the tribunal decide questions of law and policy and discretion.

*Id.* § 9.5 at 55.

The litigants may offer conflicting evidence as to adjudicative facts, which the decision-maker resolves by determining how much weight to give each side's evidence. *See* F. Scott McCown, *When Can an Agency Change the Findings or Conclusions of an Administrative Law Judge?* 50 Baylor L. Rev. 65, 74 (1998). The resolution of adjudicative facts often requires making credibility determinations. *Id.* at 76. The hearing examiner is better suited to make such determinations than is an agency head or board reviewing the hearing examiner's proposed decision because the hearing examiner has heard the evidence and has observed the demeanor of the witnesses. *Id.* In addition, a hearing examiner who is an ALJ with the State Office of Administrative Hearings (SOAH) and not employed by the agency is a "disinterested hearings officer." *Id.*

Given that the resolution of disputed adjudicative facts requires weighing the evidence and making credibility determinations, a neutral decision-maker is crucial to a fair adjudicatory hearing. *See* 2 Davis & Pierce, Jr., *supra*, § 9.8 at 67. Indeed, SOAH was created in response to fairness concerns raised by the fact that hearing examiners employed by the interested agency were directly accountable to it and, thus, did not have the appearance of disinterested hearings officers. *See* McCown, *supra*, at 67-68. The legislature also recognized, however, that in addition to providing a fair decision-maker at the hearing, there also needed to be restrictions on an agency head's ability to change the hearing examiner's decision. Agency heads once enjoyed total discretion

7

to change findings of fact and conclusions of law contained in a hearing examiner's proposal for decision. The APA has curtailed this discretion by circumscribing the purposes for which changes can be made and by requiring a reasoned explanation for each change. *See id.* at 66-67, 77-78.[8] The supreme court has recently addressed the importance of these limitations to the administrative system:

> If a board could find additional facts, resolving conflicts in the evidence and credibility disputes, it would then be serving as its own factfinder despite delegating the factfinding role to a hearing examiner, and the process of using an independent factfinder would be meaningless. An independent factfinder is integral to the structure of the hearing-examiner process; permitting a school board to select an independent factfinder avoids having the board, a party to the dispute, act as its own factfinder when reviewing the employment decision of its own administration. The Legislature has further protected the independent nature of the hearing-examiner process by requiring the board to state in writing the reason, including the legal basis, for any change or rejection it makes under section 21.259. TEX. EDUC. CODE § 21.259(d).

*Davis*, 34 S.W.3d at 564.

Contrary to these principles, in this case the Board reweighed the evidence relating to Ms. Flores's disability. We turn first to the evidence regarding the injury to Ms. Flores's back and then to the evidence of her knee injury.

***The Back Injury***

When Ms. Flores sought treatment for her injuries, she was diagnosed with two main injuries to her back. Her treating physician, Dr. Laura Flawn, diagnosed Ms. Flores with "a herniated disc on the left at L5/S1 [vertebrae]" and "arthrosis at the L4/5 [vertebrae] and a degenerative bulge

---

[8] The APA provision limiting an agency's ability to change an ALJ's findings of fact and conclusions of law is found in section 2001.058 of the Government Code. *See* Tex. Gov't Code Ann. § 2001.058 (West 2000).

at L4/5 vertebrae." The herniated disc at L5/S1 was caused by the traumatic incident; the arthritic and degenerative conditions at L4/5 were caused by the natural aging process and not by any prior injury or abnormality. ERS's Medical Board and Ms. Flores's treating physician agreed that Ms. Flores's degenerative spinal condition contributed to her total incapacity following the accident. Dr. Flawn, however, specifically distinguished the separate location of the degenerative condition and the herniated disc caused by the traumatic incident. Similarly, the ALJ's findings of fact and conclusions of law in support of her decision reflected this distinction. In contrast, the Board's revised findings of fact ignore this detail. The Board also deleted the finding reflecting Dr. Flawn's statement that the preexisting degeneration at L4-5 resulted from the natural aging process and was common for people of Ms. Flores's age (she turned fifty-three shortly after the car accident) and the finding that Ms. Flores had never experienced any back pain before the car accident. These deleted factors were all relevant to the ALJ's decision that Ms. Flores's disability qualified as an occupational disability. The Board's reweighing of the evidence was clearly designed to change the effect of Ms. Flores's preexisting condition on her disability.

### *The Knee Injury*

The medical evidence adduced at the hearing also established that Ms. Flores had suffered an injury to her knee caused solely by the accident and that the knee injury contributed to her permanent incapacity. The Board, however, added a finding that "the ERS Medical Board found that the Appellant's knee injury, in and of itself, would not likely have rendered the Appellant permanently incapacitated for the further performance of duty." The Board did not refer to any evidence presented at the hearing to support this finding, nor have we been able to locate any such

9

evidence in the record. Indeed, the Board's finding appears to contradict other evidence in the record, specifically the ERS Medical Board's own statement that it "cannot separate disability due to back and or knee. *Both* play a part in her disability" (Emphasis added). The Board abused its discretion by making a finding that is not supported by any evidence. *See Starr County v. Starr Indus. Servs., Inc.*, 584 S.W.2d 352, 355-56 (Tex. Civ. App.—Austin 1979, writ ref'd n.r.e.) (for agency to avoid a finding that it acted arbitrarily and capriciously, reviewing court must find a rational connection between facts and decision of agency); *see also Flores v. Texas Dep't of Health*, 835 S.W.2d 807, 812 (Tex. App.—Austin 1992, writ denied) (although Department is given broad discretion in arriving at its findings of fact the findings must still be based on evidence in the record).

### Board's Failure to Comply with Rule 67.91

Under its statutory authority, the Board must provide a written explanation for any change it makes to an ALJ's findings of fact or conclusions of law. *See* Tex. Gov't Code Ann. § 815.511(a) (West Supp. 2002).[9] In addition to enhancing the fairness of the adjudicative process for a party appearing before an agency, this requirement ensures that a reviewing court can judge whether the agency has followed the procedures set out in the APA and in the agency's own statute and rules. *See* McCown, *supra*, at 89 (explaining that the requirement of a written explanation provides a basis on which the reviewing court can gauge compliance with the statutes governing the

---

[9] The APA contains the minimum standards for administrative agencies. *See* Tex. Gov't Code Ann. § 2001.001(1) (West 2000). The Board stated that it was substituting its findings of fact and conclusions of law for the ALJ's pursuant to the authority of its own statute and rules, specifically, section 815.511(a) of the Government Code and Rule 67.91 in the Administrative Code. *See* Tex. Gov't Code § 815.511(a) (West Supp. 2002); 34 Tex. Admin. Code § 67.91 (2001). We will therefore specifically analyze the Board's compliance under section 815.511(a) and Rule 67.91.

10

agency's authority to change the findings). The Board has adopted Rule 67.91(b), which limits the Board's ability to make changes to the ALJ's decision by providing that it may change a finding, conclusion, or a proposal for decision (PFD) only if it is:

(1) clearly erroneous or illogical;

(2) is against the weight of the evidence;

(3) is based on misapplication of the rules of evidence or insufficient review of the evidence;

(4) is inconsistent with the terms or intent, as determined by the board, of benefit plan or insurance policy provisions; or

(5) is not sufficient to protect the public interest, the interests of the plans and programs for which the board is trustee, or the interests, as a group, of the participants covered by such plans and programs. The order shall contain a written statement of the reason and legal basis for each change made based on the foregoing policy reasons.

34 Tex. Admin. Code § 67.91(b) (2001). We will look first at the reasons given by the Board for its changes to the ALJ's findings of fact, and then at its explanation for its changes to the conclusions of law.

***Findings of Fact***

The Board's stated explanations for many of the changes made to the ALJ's findings are not consistent with the listed reasons in Rule 67.91. It changed several fact findings on the ground that the findings were not relevant. It deleted portions of other findings without providing any reason and others on the ground that the facts were not relevant because they were not in dispute.

11

The Board also added new findings of facts for "clarification." An agency is bound to follow its rules and procedures. *Southern Clay Prods., Inc. v. Bullock*, 753 S.W.2d 781, 783 (Tex. App.—Austin 1988, no writ) (citing *Gulf Land Co. v. Atlantic Ref. Co.*, 131 S.W.2d 73, 79 (Tex. 1939)). The Board failed to follow Rule 67.91 by giving stated reasons that are not authorized by the rule for some of its changes, and by failing to provide explanations for others entirely.

Moreover, the Board's changes indicate that its decision was arbitrary and capricious. Our conclusion is buttressed by the Board's explanation for its deletion of a finding: "[The finding] is deleted because it is a finding in support of an erroneous conclusion . . . ." This explanation gives the *appearance* of the Board's arriving at a predetermined result, irrespective of the facts as determined by the ALJ, and then shaping new findings of fact to support its decision. This approach is at odds with the nature of the administrative process. "A basic purpose of requiring findings of fact is to ensure that an agency's decision comes *after*, not *before*, a careful consideration of the evidence. Agency conclusions should follow from its serious appraisal of the facts." *Gulf States Utils. Co. v. Coalition of Cities for Affordable Util. Rates*, 883 S.W.2d 739, 750 (Tex. App.—Austin 1994), *rev'd on other grounds*, 947 S.W.2d 887, 891-92 (Tex. 1997);[10] *see also Davis*, 34 S.W.3d at 564.

### *Conclusions of Law*

The Board deleted the ALJ's conclusion of law that Ms. Flores's disability "directly resulted from a specific act or occurrence determinable by a definite time and place." The Board's

---

[10] We emphasize that the supreme court's opinion did not reach the issue regarding the appropriate manner of agency decision-making.

12

reasons for the deletion were that the conclusion of law was "inconsistent with the weight of the evidence" and "based on a misapplication of the provisions of the benefit plan, the policy of the Board, and of the law as interpreted by the Board." The Board's explanation quoted verbatim from a resolution it adopted after Ms. Flores's hearing and stated in part:

> The Board finds and concludes that the Legislature intended that an occupational disability, as defined in TEX GOV'T CODE ANN. § 811.001(12), must be the result of an occupational trauma (i.e., injury or disease) that is the direct cause of the member's disability. To this end, a member has been required to present credible medical evidence that a specific occupational trauma is the direct cause of the member's disability without regard to a preexisting mental or physical condition. *A disability that arises primarily as the result of degeneration that occurs over time, including, but not limited to natural age-related degeneration, cannot be described as a disability that arises as the direct result of a specific act or occurrence determinable by a definite time and place.*

(Emphasis added.) This conclusion of law seemingly identifies the relevant causal test used by the Board to decide occupational disability appeals: a disability fails to directly result from a specific act or occurrence determinable at a definite place and time if it arises *primarily* from a preexisting condition, whether or not it is age-related.

The Board, however, did not include any findings that would support its own application of this causal test to Ms. Flores's appeal. *See Starr Indus. Servs.*, 584 S.W.2d at 356 (a rational connection between the facts and the decision of the agency must be apparent). More problematically, though, the Board could not have made any findings in support of this formulation because none of the medical evidence presented at the hearing weighed in favor of a conclusion that Ms. Flores's disability arose *primarily* from degeneration. Indeed, all of the evidence suggested that Ms. Flores had no difficulty performing her job before the traumatic incident but was permanently

13

incapacitated from her duties after the accident.[11]  The Board's failure to provide any support for its conclusion that Ms. Flores's disability arose *primarily* from her preexisting condition was arbitrary and capricious.

We have previously addressed ERS's compliance with the requirement that it provide a reasoned explanation for changes it makes to an ALJ's findings of fact and conclusions of law.  *See Employees Ret. Sys. v. McKillip*, 956 S.W.2d 795, 801-02 (Tex. App.—Austin 1997, no pet.), *disapproved on other grounds by*, *Texas Natural Resources Conservation Comm'n v. Sierra Club*, 45 Tex. Sup. Ct. J. 394, 397, 2002 Tex. LEXIS 16, at *13 (Feb. 21, 2002).  We found that the agency's failure to comply with the APA's requirement for making changes to findings of fact or conclusions of law violated Ms. McKillip's substantial rights under the APA.  *Id.* at 802.  Moreover, we required ERS to provide "a rational connection" between the policy it relied on and the changes it made.  *Id.* at 801-02.  Although we decided *McKillip* under the general provision of the APA and Ms. Flores's appeal is governed by the specific provisions in ERS Rule 67.91, the Board's manner of handling Ms. Flores's appeal ignores our directive in *McKillip*.

**Board's Failure to Explain Departure from Precedent**

---

[11]  The Board also added the following findings: "Appellant's preexisting condition . . . increased the Appellant's vulnerability to serious back injury;" "her permanent disability would not have resulted from the June 1996 accident but for the preexisting conditions;" "Appellant's injuries from the automobile accident of June 1996 would not, in and of themselves, have rendered the Appellant permanently incapacitated, in the absence of the preexisting condition."  None of these findings, however, is the equivalent of a finding that Ms. Flores's disability resulted *primarily* from her degeneration; nor is such a finding warranted in light of the fact that Ms. Flores suffered a herniated disc at L5/S1 from the accident but her preexisting arthrosis was at L4/L5, and that she was also found to have an incapacitating knee injury, which was caused solely by the accident.

14

At the hearing, ERS staff contended that because Ms. Flores had a preexisting condition that contributed to her incapacity, she was not eligible for disability retirement benefits. Ms. Flores responded that the Board had held in two prior appeals, *Dean*[12] and *Link*,[13] that where a claimant's preexisting condition is merely the result of the natural aging process and is asymptomatic prior to injury, the disability qualifies as an occupational disability that "directly results from a specific act or occurrence." ERS staff attempted to distinguish *Dean* by arguing that rather than recognize a global exception for aging-related degeneration, it recognized an exception for such degeneration only where the claimant was also "elderly."[14] Ms. Flores responded that the Board's action five years later in *Link*, involving a 46-year-old claimant and decided on the basis of *Dean*, belied the staff's attempt to characterize *Dean* as an exception only for older claimants nearing retirement age. The ALJ agreed with Ms. Flores that in light of the facts of this case and the Board's prior decisions in *Dean* and *Link,* Ms. Flores's asymptomatic arthritic back degeneration did not disqualify her claim that her disability directly resulted from a specific act or occurrence determinable by a definite time and place.

---

[12]  Employees Ret. Sys. of Tex., *Appeal of Mary L. Dean*, (Mar. 16, 1994) (final order of Board granting application for benefits). The finding of facts accompanying the decision state that degenerative changes caused solely by the aging process are not considered preexisting conditions for purposes of occupational disability retirement benefits.

[13]  *Id., Appeal of Francisca G. Link*, Docket No. 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 (Aug. 18, 1999) (final order of Board granting application for benefits). The Board adopted the ALJ's proposal for decision which relied on *Dean* to grant the employee's application where the employee suffered from an age-related preexisting condition. Both the *Link* and *Dean* decisions are included in our record.

[14]  Apparently, Ms. Dean was in her 60s at the time of her appeal.

15

The Board rejected the ALJ's decision and denied the claim, relying on a policy it adopted in a resolution several months after Ms. Flores's hearing and only one day before the ALJ issued her proposed decision. In its revised conclusion of law, the Board explained that the ALJ's decision "erroneously expands the definition of occupational disability to include a disability that is primarily caused by degeneration that is the result of the natural-aging process. By the Board's decision in this appeal, the Board reiterates that it expressly rejects such an expansive interpretation of the meaning of the term 'occupational disability.'" The Board failed to provide any support for its conclusion that an exception for age-related preexisting conditions, which it had expressly recognized in *Dean* and *Link*, would have the effect of expanding the statutory definition of occupational disability beyond the legislature's intent. The Board responds that it has no obligation to follow its own prior decisions and that Ms. Flores's case is factually distinguishable from *Dean*.

An agency is not bound to follow its decisions in contested cases in the same way that a court is bound by precedent. *See Miner v. Federal Communications Comm'n*, 663 F.2d 152, 157 (D.C. Cir. 1980).[15] Courts, however, frequently require that an agency explain its reasoning when it "appears to the reviewing court that an agency has departed from its earlier administrative policy or there exists an apparent inconsistency in agency determinations." *City of El Paso v. El Paso Elec. Co.*, 851 S.W.2d 896, 900 (Tex. App.—Austin 1993, writ denied). The federal courts have similarly required reasoned explanation for an agency's departure from precedent. *See, e.g., Citizens*

---

[15] We have been unable to find a Texas case squarely addressing this issue. In a previous decision by this court, we refused to find that one prior decision that was distinguishable on its facts established binding precedent. *See Retama Dev. Corp. v. Texas Workforce Comm'n*, 971 S.W.2d 136, 139-40 (Tex. App.—Austin 1998, no pet.).

*Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 291 (1st Cir. 1995) ("any . . . alteration or reversal [of agency's prior interpretation] must be accompanied by some reasoning–some indication that the shift is rational, and therefore not arbitrary and capricious"); *Miner*, 663 F.2d at 157 (quoting *Food Marketing Inst. v. Interstate Commerce Comm'n*, 587 F.2d 1285, 1290 (D.C. Cir. 1978)) ("'while agencies may not be bound under the doctrine of *stare decisis* to the same degree as courts, . . . it is at least incumbent upon the agency carefully to spell out the bases of its decisions when departing from prior norms.'"); *National Conservative Political Action Comm. v. Federal Election Comm'n*, 626 F.2d 953, 959 (D.C. Cir. 1980) ("agencies are under an obligation to follow their own regulations, procedures, and precedents, or provide a rational explanation for their departures").

Furthermore, we have held that when an agency adopts new policy in the course of a contested-case hearing without giving the parties pre-hearing notice, the parties may be deprived of procedural due process. *See Seely*, 764 S.W.2d at 815; *Madden*, 663 S.W.2d at 625-27. For a hearing to be meaningful, the parties must be able to present evidence on the issues to be decided. Had Ms. Flores known that the Board no longer intended to apply the *Dean* exception for preexisting conditions caused solely by aging, she might have presented her case differently. The Board's post-hearing action prevented her from doing so; the Board's rejection of the *Dean* and *Link* precedent months after her hearing was thus arbitrary and capricious. *See Starr Indus. Servs.*, 584 S.W.2d at 356 ("the major factor that runs throughout arbitrary-capricious review cases is that the parties must be able to know what is expected of them in the administrative process.").

17

There are serious flaws with the Board's manner of deciding Ms. Flores's appeal. We hold that the Board acted arbitrarily and capriciously by: deciding this appeal before it arrived at its findings of fact and conclusions of law, reweighing adjudicative facts, changing findings of fact and conclusions of law for unauthorized and unexplained reasons, making findings of fact and conclusions of law without adequate support in the record, and failing to give notice before the hearing of its intention not to follow previous decisions and failing to adequately explain the reasoning for its change in position. We therefore sustain Ms. Flores's first issue.

## STATUTORY INTERPRETATION

Ms. Flores next challenges the Board's interpretation of the two-pronged statutory definition of occupational disability.

## Standard of Review

An administrative agency's construction or interpretation of a statute, which the agency is charged with enforcing, is entitled to serious consideration by reviewing courts, so long as that construction is reasonable and does not contradict the plain language of the statute. *Employees Ret. Sys. v. Jones*, 58 S.W.3d 148, 151 (Tex. App.—Austin 2001, no pet.) (citing *Steering Comms. for the Cities Served by TXU Elec. & Cent. Power & Light Co. v. Pub. Util. Comm'n*, 42 S.W.3d 296, 300 (Tex. App.—Austin 2001, no pet.). However, when the interpretation does not involve technical or regulatory matters within the agency's expertise but requires the discernment of legislative intent, we give much less deference to the agency's reading of a statute. "Courts do not defer to administrative interpretation in regard to questions which do not lie within administrative

18

expertise, or deal with a nontechnical question of law." 2B Norman J. Singer, *Statutes & Statutory Construction* § 49:04, at 23-24 (6th ed. 2000). The Board rejected the ALJ's conclusions of law that Ms. Flores's disability directly resulted from a specific act or occurrence and that it directly resulted from a risk or hazard peculiar to her duties of state employment, explaining that these conclusions impermissibly "expand[] the definition of occupational disability" in derogation of legislative intent as expressed in section 811.001(12).

In determining whether the ALJ impermissibly expanded this definition by awarding benefits to Ms. Flores, our objective is to determine and give effect to the legislature's intent. *National Liab. & Fire Ins. Co. v. Allen,* 15 S.W.3d 525, 527 (Tex. 2000); *Jones,* 58 S.W.3d at 151. Thus, the task of statutory construction here does not involve a matter lying within the Board's expertise, but involves a question of law: What did the legislature intend when it used the phrases "directly results from a specific act or occurrence" and "directly results from a risk or hazard peculiar" to a duty arising from state employment? We look at the phrases in context, based on the ordinary meaning of the words. *Rylander v. Fisher Controls Int'l. Inc.*, 45 S.W.3d 291, 302 (Tex. App.—Austin 2001, no pet.). As we stated in *Fisher Controls*, courts are as competent as the Board in assessing legislative intent and this reduces considerably the degree of judicial deference owed the Board's interpretation of section 811.001(12). *Id.*

We will first address the Board's interpretation of the causal relationship intended between an employee's at-work injury and her disability.

**"Directly Results from a Specific Act or Occurrence"**

19

The Board rejected the ALJ's conclusion of law that Ms. Flores's injury directly resulted from a specific act or occurrence determinable by a definite time and place. The parties dispute the level of causation required by this prong of the definition of occupational disability. While it is clear that there must be a causal nexus between the on-the-job injury and the claimant's permanent incapacity, the statute does not define the standard in recognizable terms such as "sole cause," "proximate cause," or "producing cause." Moreover, "directly results" is the only reference to causation for occupational disability in the statute. Adding to the uncertainty regarding the precise standard of causation the statute requires is the Board's inconsistent interpretation of "directly results."

The Board's current position is that if the injury aggravates a preexisting condition that contributes to her disability, the claimant is disqualified from receiving disability retirement benefits. Before this case the Board had held that some preexisting conditions, namely those caused by the natural aging process, do not disqualify claimants from receiving benefits. In Ms. Flores's appeal, the Board changed this policy and announced without explanation that applying its previous exception for age-related preexisting conditions "erroneously expands the definition of occupational disability." This requires us to determine what the second prong of the statute encompasses by the phrase "directly results from a specific act or occurrence determinable by a definite time and place."

To interpret this definition, we must determine the causal nexus that the legislature intended between the specific traumatic incident and the resulting disability. We have never considered the issue of causation for occupational disability in the context of the Employees Retirement Systems Act. The courts have considered the issue of causation in the context of

20

disability insurance in the private sector. The words "directly" and "result" appear together frequently in private accidental-disability insurance policies. *See, e.g.*, *American Home Assurance Co. v. Harbison*, 576 S.W.2d 485, 486 (Tex. Civ. App.—Houston [14th Dist.] 1979, writ dism'd); *Bohon v. Travelers Ins. Co.*, 509 S.W.2d 905, 906 (Tex. Civ. App.—Tyler 1974, no writ); *American Exch. Life Ins. Co. v. Willis*, 433 S.W.2d 945, 946-47 (Tex. Civ. App.—Tyler 1968, no writ). The phrase "resulting directly" is found routinely in disability insurance, but is always modified by language not found in section 811.001(12): "resulting directly *and independently of all other causes*." *See Harbison*, 576 S.W.2d at 486; *Bohon*, 509 S.W.2d at 906; *Willis*, 433 S.W.2d at 946-47 (emphasis added). This phrase has been interpreted to create a sole-cause standard:

> The evidentiary burden incumbent upon one who claims under an accident insurance policy of the type here involved is now settled. The phrase " . . . directly and independently of all other causes . . . " is construed in law to mean the "sole" or "only" cause. Thus, under such a clause, it is the claimant's burden to prove that the insured's peril was the sole cause of disability, i.e., that it did not concur to any degree with other nonaccidental causes, and mere proof that the insured's peril is "a" cause or even a "but for" cause, within the concept of "proximate cause," is not sufficient.

*Bohon*, 509 S.W.2d at 907 (citing *Mutual Benefit Health & Accident Ass'n v. Hudman*, 398 S.W.2d 110, 112-13 (Tex. 1965)).

The additional language "and independently of all other causes" plainly limits compensable injuries to those that solely cause the disability. This limiting language is not found in section 811.001(12). The legislature could have easily used this or similar language in the definition of occupational disability retirement benefits and we assume that it would have done so had it intended to impose a sole-cause standard in the disability retirement context. *See Texas Dep't of*

21

*Human Servs. v. Hinds*, 904 S.W.2d 629, 634 (Tex. 1995) (presuming that legislature would have specified a sole-cause standard in the whistleblower statute and that the causal language "because" indicated a lesser standard). The lack of any such language modifying "directly results" is some evidence that the legislature did not intend to impose a sole-cause standard. *See id.* We assume that the omission of such limiting language was a deliberate choice by the legislature, and thus we conclude that the language of section 811.001(12) does not require an employee to prove that her injury is the sole cause of her disability.

The Board urges that any disability caused both by a traumatic incident and a preexisting condition cannot logically directly result from a specific act or occurrence determinable by a definite time and place. "Directly" is not synonymous with "solely,"[16] and nothing in the plain meaning of the statute mandates disqualifying every claimant who has a preexisting condition that is aggravated by the injury. Had the legislature intended a sole cause standard, it could have given some indication, for example, by using "solely results" or "directly results independently of all other causes." It did not do so. Furthermore, the position adopted by the Board in Ms. Flores's appeal is inconsistent with its prior interpretation of the statute in *Dean* (1994), an interpretation re-affirmed in *Link* (1999). *See J.M. Falkner v. Southwestern Sav. & Loan Ass'n.*, 320 S.W.2d 164, 171 (Tex. Civ. App.—Austin 1958) (op. on reh'g), *aff'd in part, rev'd in part on other grounds*, 331 S.W.2d 917, 923 (Tex. 1960) ( courts should give weight to a construction that is long-continued and

---

[16] Compare some of the definitions of "sole": "being the only one or ones, only"; "being the only one of the kind," "belonging or pertaining to one individual or group to the exclusion of all others," with some of the definitions of "direct": "proceeding in a straight line or by the shortest course," "personal or immediate," "straightforward, frank," "inevitable, consequential." Jess Stein, Ed., *Random House College Dictionary*, (revised ed. 1984).

22

uniform).  Here the Board's conclusion regarding the effect of age-related preexisting conditions is not sanctioned by long acquiescence and this diminishes the consideration this Court affords its construction of the statute.  *See Fisher Controls*, 45 S.W.3d at 302.  Moreover, the statutory definition at issue involves the assessment of legislative intent, a matter this court is equally competent to discern.  *See id.*  After considering the plain meaning of the words used in section 811.001(12), we reject the Board's reading that the legislature intended to qualify only those occupational disabilities caused solely by a specific act or occurrence independent of any preexisting condition. We must still determine, however, what causal standard the legislature did intend.

There has been considerable discussion of causation under the Workers' Compensation Act which, like the ERS statute, provides benefits for employees who suffer an occupational injury or disease.  We recognize the different purposes furthered by that Act.  One of the primary goals of the Workers' Compensation Act is to protect employees against risks or hazards taken or imposed on them in order to perform the employer's work or business.  *Texas Employers Ins. Ass'n v. Grammar*, 157 S.W.2d 701, 704 (Tex. Civ. App.—Dallas 1941, writ ref'd w.o.m.). That is, workers' compensation is intended to transfer from the worker to the industry the economic loss due to industrial accidents and injuries.  *Employers Mut. Liab. Ins. Co. v. Konvicka*, 197 F.2d 691, 693 (5th Cir. 1952).  Workers' compensation benefits are designed to compensate an injured employee for loss of earnings as well as earning capacity.  *See Texas Employers' Ins. Ass'n v. Davidson*, 295 S.W.2d 482, 486 (Tex. Civ. App.—Fort Worth 1956, writ ref'd n.r.e.).  On the other hand, occupational disability retirement benefits are not designed to replace wages but rather to allow

23

an incapacitated state employee to begin drawing pension payments when she is unable to work until normal retirement age.

Another distinction is that the Workers' Compensation Act has, from its inception, been liberally construed in favor of injured workers. *See Waldrep v. Texas Employers Ins. Ass'n*, 21 S.W.3d 692, 698 n.10 (Tex. App.—Austin 2000, pet. denied ); *Texas Employers' Ins. Ass'n v. Moore*, 284 S.W.2d 175, 176 (Tex. Civ. App.—Amarillo 1955, writ ref'd n.r.e.). Under that act, workers' compensation benefits are an injured employee's exclusive remedy, *see* Tex. Lab. Code Ann.§ 408.001(a) (West 1996); thus, an employee forfeits the right to maintain a common-law cause of action against her employer for negligence. A liberal construction of the act in favor of an employee's recovery has been seen as necessary in light of the employee's abrogation of common law remedies. *See Hargrove v. Trinity Universal Ins. Co.*, 256 S.W.2d 73, 75 (Tex. 1953) ("since the workman coming under the terms of the Act is denied his common law rights it is held that the Act should be liberally construed in his favor."). By contrast, the statute governing occupational disability retirement benefits does not require a claimant to waive any rights that she has under the common law.

Nonetheless, the Workers' Compensation Act is similar in that it provides compensation for like types of injuries–occupational injuries and diseases that result in death or disability.[17] And, to receive statutory workers' compensation benefits, claimants must provide

---

[17] Compare language of Tex. Gov't Code Ann. § 811.001(12) (West Supp. 2002) ("injury or disease that directly results from a specific act or occurrence determinable by a definite time and place, and directly results from a risk or a hazard peculiar to and inherent in a duty that arises from and in the course of state employment"), with language describing compensable injury under workers' compensation statute, *Employers Mut. Liab. Ins. Co. v. Konvicka*, 197 F.2d 691, 693-94 (5th Cir.

24

evidence of a sufficient causal nexus between the workplace accident and the claimant's disability. Under the current workers' compensation scheme, a compensable injury is "damage or harm to the physical structure of the body and a disease or infection naturally resulting from the damage or harm. The term includes an occupational disease." Tex. Lab. Code Ann. § 401.011(26) (West Supp. 2002). The courts have interpreted "naturally resulting" to encompass a "producing-cause" standard, which is similar to proximate cause although without the requirement of foreseeability. *See Texas Indem. Ins. Co. v. Staggs*, 134 S.W.2d 1026, 1028-29 (Tex. 1940); *National Farmers Union Prop. & Cas. Co. v. Degollado*, 844 S.W.2d 892, 897 (Tex. App.—Austin 1992, writ denied).

The focus of proximate cause is to determine whether there is an "unbroken causal connection between the injury and the disability or death." *Staggs*, 134 S.W.2d at 1030. A cause is a proximate cause if, in a natural and continuous sequence it produces the harm, and if without it the harm would not have occurred. *See Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 471 (Tex. 1991). As the term "proximate cause" is used in negligence law, the cause must also be a substantial factor in bringing about the harm. *Id.* at 471-72(quoting Restatement (Second) of Torts § 431, cmt. a (1965)). Because of the liberal interpretation of the Workers' Compensation Act, however, a workplace injury or disease is considered to be a producing cause even if it is not a substantial factor in bringing about the disability. That is, the workplace injury need not be the primary cause of the employee's disability; rather, as long as the occupational injury is *a* producing cause of the disability, there is a sufficient causal link under the workers' compensation scheme. *See INA of Tex. v. Howeth*,

_____

1952) ("[a]n injury has to do with, and arises out of, the work or business of the employer, when it results from a risk or hazard which is necessarily or ordinarily or reasonably inherent in or incident to the conduct of such work or business").

25

755 S.W.2d 534, 536-37 (Tex. App.—Houston [1st Dist.] 1988, no writ); *Texas Employers' Ins. Ass'n v. Charles*, 381 S.W.2d 664, 668 (Tex. Civ. App.—Texarkana 1964, writ ref'd n.r.e.). An unrelated condition or injury may be the primary factor in causing the employee's disability, but unless the carrier can prove that such unrelated factor was the *sole cause* of the employee's incapacity, an employee remains eligible for workers' compensation benefits. *See Degollado*, 844 S.W.2d at 896-97.

This framework is appropriate in cases brought under the Workers' Compensation Act, in which the courts have deemed that a liberal construction of the statute in favor of injured workers is necessary given the abrogation of workers' common-law rights. We believe there are compelling reasons why this same framework should not be adopted to govern occupational disability retirement cases under the ERS statute. There is no indication of an intent for an employee to recover disability retirement benefits without showing that the occupational injury is the primary cause of her disability.

Although there may be several producing causes of a disability, there can be only one *primary* cause. Under this standard, an employee seeking occupational disability retirement benefits must establish that a specific act or occurrence determinable by a definite time and place is the cause-in-fact of her disability, namely, that the injury in a natural and continuous sequence produced the disability, and that without it, the disability would not have occurred. *See Lear Siegler, Inc.*, 819 S.W.2d at 471. Moreover, the employee must prove that the at-work injury is the *primary* cause of the disability. A preexisting condition that becomes symptomatic only at the time of trauma or that does not primarily cause the disability does not break the causal chain between the at-work injury and

26

the disability. This is true even if a preexisting condition makes the injury more difficult to treat or more disabling. A preexisting condition that substantially contributes to a disability, however, such that the preexisting condition is the *primary* cause of the disability, will defeat a claim for occupational disability retirement.

The Board then correctly expressed in its conclusion of law that a disability that arises primarily from a preexisting condition is not a disability that directly results from a workplace incident. We disapprove the Board's additional statement that an employee must establish that an "occupational trauma is the direct cause of the [employee's] disability *without regard to a preexisting mental or physical condition*" because this infers that an employee with a preexisting condition that is aggravated by an occupational trauma may be disqualified even if the specific act or occurrence is the *primary* cause of her disability. (Emphasis added).

The primary-cause standard, by requiring a claimant to provide evidence of a substantial link between her incapacity and a work-related accident, ensures that the scope of disability retirement benefits is not expanded to encompass disabilities that bear only remotely on an injury sustained as a result of a claimant's state employment. The standard also addresses the reality that a traumatic injury often interacts with other factors to produce a disability. It thus alleviates the harsh consequences that flow from the "without-regard to preexisting conditions" rule that would disqualify all claimants who have any dormant preexisting conditions, even age-related back degeneration. The ALJ's findings reflect that Ms. Flores suffered from a dormant preexisting condition, which did not significantly affect her ability to work but which became symptomatic as a result of the trauma. Where the preexisting condition is caused solely by a natural aging process and

27

not by an abnormal disease, there is a more compelling reason not to disqualify the claim. Even courts applying a sole-cause standard of causation for occupational disability have drawn this distinction:

> A distinction, then, is to be drawn between a morbid or abnormal condition of such quality or degree that in its natural and probable development it may be expected to be a source of mischief, in which event it may fairly be described as a disease or an infirmity, and a condition abnormal or unsound when tested by a standard of perfection, yet so remote in its potential mischief that common speech would call it not disease or infirmity, but at most a predisposing tendency.

*Willis*, 433 S.W.2d at 949; *see also Harbison*, 576 S.W.2d at 487 ("while 'independent cause' means 'sole cause,' '[r]ecovery is not defeated when a preexisting condition or disorder is so remote in the scale of causation, so dormant and insubstantial, or so temporary and transient that it does not materially contribute to the death or injury'"); *Fidelity & Cas. Co. v. Manley*, 132 F.2d 127, 128 (5th Cir. 1942) ("it is of no legal significance that the injuries sustained did not alone produce the condition complained of, since they acted as a catalytic agent upon otherwise dormant physical symptoms").

By using "directly results from a specific act or occurrence" as part of the qualification for disability retirement benefits, the legislature did not mandate that the injured employee be free from all preexisting conditions. Degenerative conditions like Ms. Flores's osteoarthritis typically begin during one's twenties and thirties and almost everyone has degenerative changes by age forty, although relatively few people have symptoms. Merck Manual online, "Osteoarthritis," <http://www.merck.com/pubs/mmanual/section5/chapter52/52a.htm>. The legislature cannot have intended to disqualify the vast majority of state employees from eligibility for disability retirement

28

benefits; such a result is not mandated by the statutory scheme. Interpretations that would produce absurd results are to be avoided. *Jones*, 58 S.W.3d at 153. We accept the Board's conclusion of law that a disability directly results from an on-the-job injury if the injury is the primary cause of the employee's disability. However, we reject its additional holding that this primary causal connection must be determined without regard to preexisting mental or physical conditions.

We affirm the Board's conclusion that where the claimant's preexisting condition is the primary cause of disability, the disability does not directly result from the injury. But there is no evidence in this record to support a finding that Ms. Flores's degenerative back was the primary cause of her disability. Therefore, the Board erred in rejecting the ALJ's conclusion of law that Ms. Flores's injury directly resulted from a specific act or occurrence determinable by a definite time and place. We again emphasize that where the hearing officer has weighed the credibility of the evidence in making a finding about the causal effect of the preexisting condition, it is not the Board's function to reweigh the evidence and change the adjudicative facts, unless they are clearly erroneous or suffer from another legal infirmity encompassed by Rule 67.91(b).

We will next address the Board's interpretation of when a risk or hazard is peculiar to a duty that arises from and in the course of state employment. In reviewing the Board's interpretation of this second prong of the definition, we are particularly mindful that the Board specifically relies on a previous pronouncement by this court rather than a legislative pronouncement of intent.

**"Risk or Hazard Peculiar to a Duty"**

29

We have previously addressed the second prong of section 811.001(12) in *Bond v. Employees Retirement System*, 825 S.W. 2d 804 (Tex. App.—Austin 1992, writ denied).[18] Relying specifically on our *Bond* decision, the Board determined that an aide's risk or hazard of being involved in a car accident while driving her young clients within the scope of her employment does not meet the statutory definition of "peculiar": "[Ms.] Flores did not prove that by virtue of her duty to transport children she was exposed to a risk *different from* that experienced by every other person who was on the highway that day." (Emphasis added.) Allegedly relying on our interpretation of "peculiar," the Board reversed the ALJ's conclusion of law that Ms. Flores's injury was caused by a risk or hazard peculiar to her duties. The Board has misread our holding in *Bond*.

In *Bond*, we surveyed some of the dictionary definitions of peculiar: "tending to be characteristic of one only," "distinctive," "different from the usual or normal," "singular," "special," and "particular." *Id.* at 806 (citing G. &C. Merriam Co., *Webster's Third New International Dictionary* 1163 (1969)). But we did not hold that to be peculiar, a risk experienced by a state employee performing a duty arising from state employment must somehow be *different from* the risk experienced by every other person engaged in the *same* activity. We will revisit the facts presented in *Bond* to clarify our holding in that opinion.

Doris Bond was employed as a nurse with the Department of Corrections and was asked to come in for a staff meeting on her day off. *Id.* at 805. She arrived at the parking lot and a

---

[18] Appellant challenges as an initial matter the Board's statutory interpretation that the inherent risk or hazard must also be peculiar to a duty arising from state employment. Our previous decision in *Bond* has foreclosed appellant's argument. *See Bond v. Employees Ret. Sys.*, 825 S.W.2d 804, 806 (Tex. App.—Austin 1992, writ denied). Therefore, we address only Ms. Flores's challenge to the Board's interpretation of the word "peculiar."

strong gust of wind slammed the truck door against her leg as she was getting out of the vehicle, seriously injuring her knee. *Id.* We upheld the Board's determination that her injury did not directly result from a risk or hazard peculiar to her state duties: "This was not a case in which Bond was injured while working with patients as a nurse. Rather, Bond's injury resulted from a risk to which all persons in the vicinity of the storm were exposed." *Id.* at 806 (citations omitted). Ms. Bond was employed by the state as a nurse and, as we observed, she was not engaged in nursing duties when she was injured. The nature of Ms. Bond's state employment as a nurse did not routinely subject her to the risk of injury by gusts of wind. Therefore, we concluded that the risk of getting out of her car in the wind was a risk common to storms, not a risk peculiar to duties assumed by nurses. We did not mean that a risk or hazard arising from and in the course of Ms. Bond's nursing duties would be peculiar only if it were somehow *different from* the risk assumed by other persons engaged in nursing activities. To the contrary, a risk or hazard is peculiar to a duty if that duty imposes a risk or hazard different from the usual or normal risks encountered by a person *not* engaged in that duty. We find no basis in the statute, in our *Bond* opinion, or in the plain meaning of the word "peculiar" for the Board's overly restrictive definition of that word in this statute.

Unlike Ms. Bond, Ms. Flores was injured while performing her duties of transporting children who were in the care of the Department, where she was employed. Ms. Flores's job was defined by one primary task: driving children entrusted to the Department. The Department's performance/development plan and evaluation for Ms. Flores lists transporting clients as her foremost duty; Ms. Flores spent between seven and twelve hours each day, or seventy-five percent of her working hours, in a car. Thus, she faced a much higher risk of being injured in a car accident than

31

incidental drivers. The increased risk of an accident faced by Ms. Flores, not the general risk shared by the driving public, was an inherent risk that was particular to her duties as an aide. We hold that there is abundant evidence in the record that the risk of being injured in a car accident was peculiar to Ms. Flores's duties within the scope of her state employment. The ALJ so found in her findings of fact and in her conclusions of law.

The Board defends its definition of "peculiar" by insisting that the legislature intended to narrowly limit the scope of occupational disabilities and that we recognized this narrow scope in *Bond*. We disagree. In *Bond*, we affirmed the denial of a claim because Ms. Bond was not injured while performing her peculiar duties of employment as a nurse. Our language regarding the narrow scope of an occupational disability must be read in that context only. Neither the *Bond* decision nor the statute defines occupational disability to exclude an injury arising from a risk or hazard that is peculiar to the specific duties of state employment, such as we have here.

We hold that the Board erred in rejecting the ALJ's conclusion of law that Ms. Flores's injury directly resulted from a risk or hazard peculiar to and inherent in a duty arising from her state employment.

We sustain the second issue on appeal and hold that the Board has erroneously interpreted both prongs of the statute defining an occupational disability.

## CONCLUSION

We hold that the Board disregarded Ms. Flores's substantial rights by deciding this appeal before it arrived at its findings of fact and conclusions of law, reweighing adjudicative facts, changing findings and conclusions for unauthorized and unexplained reasons, making findings of fact

32

and conclusions of law without adequate support in the record, and failing to give notice before the hearing of its intention not to follow previous decisions and failing to adequately explain the reasoning for its change in position. We therefore hold that the Board acted arbitrarily and capriciously and abused its discretion.

We further hold that in reversing the ALJ on both prongs of the definition of occupational disability the Board applied an erroneous interpretation of section 811.001(12). As to the first prong, we reject the Board's interpretation that a claimant must prove that a traumatic act or occurrence caused her disability without regard to any preexisting mental or physical condition. Based on the plain meaning of "directly results from a specific act or occurrence determinable by a definite time and place," we hold that the legislature intended a primary-cause relationship between an employee's traumatic injury and her disability. A claimant need not prove that her disability was caused by the traumatic incident alone without regard to a preexisting mental or physical condition. The claimant must, however, prove that her disability was primarily caused by the injury. As to the second prong, we reiterate that a risk or hazard is "*peculiar* to . . . a duty . . . that arises from and in the course of state employment" if that duty imposes a risk or hazard different from the usual or normal risks encountered by a person *not* engaged in that duty.

Therefore, we reverse the judgment of the trial court and the Board's order and remand this cause to the Board for further proceedings consistent with this opinion.

_____

Bea Ann Smith, Justice

Before Justices Kidd, B. A. Smith and Patterson:  Opinion by Justice B. A. Smith;
   Dissenting Opinion by Justice Patterson

Reversed and Remanded

Filed:   April 18, 2002

Publish