# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-01-00081-CV

**Calvin R. Langford, Appellant**

**v.**

**Employees Retirement System of Texas, Appellee**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT
NO. GN002512, HONORABLE MARGARET A. COOPER, JUDGE PRESIDING**

This case raises similar issues and is controlled by our recent decision in *Flores v. Employees Retirement System*, No. 03-01-00074-CV, 2002 Tex. App. LEXIS 2721 (**Austin Apr. 18, 2002, no pet. h.**).  Where appropriate, we will rely on our reasoning and holdings in that opinion. Tex. R. App. P. 47.1.

Appellant Calvin Langford appeals the district court=s judgment affirming a final order by the Board of the Employees Retirement System of Texas (hereinafter Athe Board@) denying his

application for occupational disability benefits.[1] Mr. Langford raises the same issues that were raised in *Flores*: whether the Board acted arbitrarily and capriciously or abused its discretion by applying a new policy in the course of his contested case without affording him notice of its intent to do so, and whether the Board erroneously interpreted the statutory definition of occupational disability. Additionally, he complains about the trial judge=s ruling denying his request to supplement the administrative record. As we sustain two of Mr. Langford=s issues, we will reverse the judgment of the trial court.

## FACTUAL BACKGROUND

Calvin Langford was employed by the Texas Department of Criminal Justice as a food service manager at one of its correctional facilities. Mr. Langford=s position required him to supervise food service workers, including inmates and employees, in the preparation and storage of food and in the inspection and maintenance of the kitchen facility in a sanitary and safe manner. Departmental policy required the kitchen floor to be cleaned at least once each day. As he approached an inmate who was mopping the floor to tell him to put a AWet Floor@ sign out, Mr. Langford slipped and fell on the wet kitchen floor. The inmate had failed to use the appropriate cleaner, using instead a highly

---

[1] We will refer to several entities throughout this appeal. The ABoard@ refers to the agency=s board of trustees, which hears appeals of contested cases. *See* Tex. Gov=t Code Ann. ' 815.511 (West Supp. 2002). The AMedical Board@ refers to the agency=s medical board, which certifies occupational disability retirement claimants as disabled. *See id.* ' **814.203 (West 1994) (**providing that the medical board shall issue a certification of disability if it Afinds that the member is mentally or physically incapacitated for the further performance of duty, that the incapacity is likely to be permanent, and that the member should be retired@). AERS staff@ refers to the agency=s representatives at the administrative hearing before the State Office of Administrative Hearings.

concentrated dishwashing detergent which, when applied to the floor, made it extremely slick. Mr. Langford testified that even though he was wearing skid-resistant shoes, he fell, catching his leg on a cooking grill and landing in an awkward position. Mr. Langford sustained serious injury to his back and is permanently disabled. He was dismissed from his job several months after the accident.

After his dismissal, Mr. Langford applied for disability retirement benefits from the Employees Retirement System (AERS@),[2] which was created by the legislature for the purpose of providing a retirement system for Aaged and incapacitated state employees.@ Act of 1947, 50th Leg., R.S., ch. 352, 1947 Gen. Laws 697, 697 (statement of purpose). Mr. Langford applied for occupational disability retirement benefits[3] and was certified by the Medical Board as permanently incapacitated from the further performance of his duties. His application was denied, however, because the Board found that his disability did not meet the statutory criteria for occupational disability retirement benefits.

---

[2]     The Employees Retirement System=s (ERS=s) governing statute, which is subtitled AEmployees Retirement System of Texas@ is found at sections 811.001-815.512 of the Government Code. *See* Tex. Gov=t Code Ann. '' 811.001-815.512 (West 1994 & Supp. 2002).

[3]     ERS provides four types of benefits for eligible state employees: service retirement, occupational disability retirement, nonoccupational disability retirement, and death benefits. Tex. Gov=t Code Ann. ' 814.001 (West 1994).

The criteria are found in section 811.001(12) of the Government Code, which defines occupational disability to mean a disability "from an injury or disease that directly results from a specific act or occurrence determinable by a definite time and place, and directly results from a risk or a hazard peculiar to and inherent in a duty that arises from and in the course of state employment." Tex. Gov=t Code Ann. ' 811.001(12) (West Supp. 2002).[4] ERS denied Mr. Langford=s claim, finding that his disability failed to satisfy either statutory prong of the definition. He appealed, and after an administrative hearing, the administrative law judge (ALJ) found that Mr. Langford=s application satisfied both requirements and recommended in his proposal for decision (PFD) that occupational disability benefits be awarded. The Board rejected the ALJ=s findings of fact and conclusions of law[5] as to both statutory prongs and denied benefits. The Board=s interpretation of the statutory definition for disability benefits in this appeal is identical to the definitions it adopted in the *Flores* appeal. We have held that the Board erroneously interpreted both prongs of the statute. *Flores*, No. 03-01-00074-CV, slip op. at 33, 2002 Tex. App. LEXIS 2721, at *54-55 . Mr. Langford has also challenged the manner in which the Board decided his appeal, contending that the Board violated his substantial rights by failing to provide him with a meaningful hearing as required by the Administrative Procedure Act (APA). For the same reasons that we explained in *Flores*, we hold that the Board=s

---

[4] As in *Flores v. Employees Retirement System*, No. 03-01-00074-CV, 2002 Tex. App. LEXIS 2721 (**Austin Apr. 18, 2002, no pet. h.**), the current code is cited for convenience.

[5] *See* Tex. Gov=t Code Ann. ' **815.511(a) (West Supp. 2002) (authorizing the Board to change or delete findings of fact and conclusions of law contained in a proposal for decision submitted by an administrative law judge or other hearing examiner and to make alternative findings of fact and conclusions of law in contested cases, and requiring Board to state in writing its specific reasons for doing so);** 34 Tex. Admin. Code ' 67.91(b) (2001) (requiring written explanation for any change and providing criteria for authorized changes)**.**

decision-making process was arbitrary and capricious and an abuse of discretion. As a preliminary matter, we turn first to an issue raised by Mr. Langford regarding additional evidence.

## ADDITIONAL EVIDENCE

Mr. Langford argues in his first issue that the trial court erred by refusing to admit into evidence a resolution that the Board adopted after the ALJ submitted his PFD and before the Board issued its order rejecting the ALJ=s decision and denying the application for benefits. Mr. Langford cites section 2001.175(c) of the Government Code in support of his argument that the trial court should have admitted the resolution, despite the fact that it was not part of the administrative record. *See* Tex. Gov=t Code Ann. ' 2001.175(c) (West 2000). The provision reads:

> A party may apply to the court to present additional evidence. If the court is satisfied that the additional evidence is material and that there were good reasons for the failure to present it in the proceeding before the state agency, the court may order that the additional evidence be taken before the agency on conditions determined by the court. The agency may change its findings and decision by reason of the additional evidence and shall file the additional evidence and any changes, new findings, or decisions with the reviewing court.

*Id.*

We review the district court=s decision to grant or deny a remand request under an abuse of discretion standard. *Gulf States Utils. Co. v. Coalition of Cities for Affordable Util. Rates*, 883 S.W.2d 739, 747-48 (Tex. App.CAustin 1994, no writ). Section 2001.175(c) enables the district court to remand the case to the agency for the admission of the additional evidence. *Texas Oil & Gas Corp. v. Railroad Comm=n*, 575 S.W.2d 348, 351 (Tex. Civ. App.CAustin 1978, no writ) (discussing virtually identical predecessor version of section 2001.175(c)). Mr. Langford, however, argues that

**5**

the district court erred by not admitting the evidence for consideration in connection with the district-court case. Mr. Langford misunderstands the purpose of section 2001.175(c), which is to give a party the opportunity to present additional evidence to the *agency* for its consideration; it is not intended to enable a party to present evidence before a reviewing court. We also note that the resolution does not constitute Aadditional evidence@ as contemplated by section 2001.175(c); if anything, the resolution may constitute evidence of Aprocedural irregularities alleged to have occurred before the agency that are not reflected in the record.@ *See* Tex. Gov=t Code Ann. ' 2001.175(e). Mr. Langford does not rely on section 2001.175(e), however, and in any event, the resolution is already before us and is included in the record; additionally, a large portion of the resolution is quoted verbatim in the Board=s conclusions of law. Therefore, we overrule Mr. Langford=s first issue. We now turn to his argument that the Board acted arbitrarily and capriciously in denying his appeal.

## ARBITRARY & CAPRICIOUS

In his second issue, Mr. Langford raises the same issues regarding the Board=s manner of decision-making as were raised in *Flores* and asserts that the Board=s action was arbitrary and capricious or constituted an abuse of discretion under section 2001.174(2)(F) of the APA. *See* Tex. Gov=t Code Ann. ' 2001.174(2)(F) (West 2000).[6] As in *Flores*, the manner in which the Board decided this appeal raises serious concerns as to whether the Board respected Mr. Langford=s due-process rights. A brief recitation of the facts highlights these concerns. After hearing all of the evidence

---

[6] The section requires a reviewing court to reverse or remand a case Aif substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are . . . arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of

at the contested-case hearing on September 30, 1999, the ALJ decided in Mr. Langford=s favor on October 28. The Board adopted new policies in a resolution on December 8. This same resolution limited the viability of some of the Board=s previous decisions on which Mr. Langford had relied at the hearing. The Board met to consider Mr. Langford=s appeal on April 19, 2000. The minutes of that meeting, of which we take judicial notice, reflect that immediately after hearing from both sides and without any deliberation, the Board declined to adopt the ALJ=s recommendation and denied Mr. Langford=s appeal. After announcing its decision, the Board also ordered its general counsel to make new findings of fact and conclusions of law. The revised findings of fact and conclusions of law, which were later adopted by the Board, relied on the new policies announced in the post-hearing resolution.

Moreover, the Board=s findings of fact and conclusions of law made systematic and widespread changes and additions to the ALJ=s findings of fact and conclusions of law. The Board=s changes to particular facts suggest that the Board was acting as its own fact finder despite having delegated that duty to the ALJ. *See Montgomery Indep. Sch. Dist. v. Davis*, 34 S.W.3d 559, 564 (Tex. 2000) (A[h]aving chosen to delegate the fact-finding role to the hearing examiner, a board cannot then ignore those findings with which it disagrees and substitute its own additional findings@); *Flores*, No. 03-01-00074-CV, slip op. at 7-8, at *8-9. In addition, in some instances, the Board failed to comply with its statute and administrative rules, which authorize the Board to make changes but also

---

discretion.@ Tex. Gov=t Code Ann. ' 2001.174(2)(F) (West 2000).

place limits on its ability to do so.  *See* Tex. Gov=t Code Ann. ' 815.511(a) (West Supp. 2002); 34

Tex. Admin. Code ' 67.91(b) (2001) (Rule 67.91(b).[7]

The manner by which the Board decided Mr. Langford=s appeal raises serious due process concerns, specifically in its (1) failing to put Mr. Langford on notice as to the grounds on which the Board would rely for its decision; (2) arriving at a result on grounds other than those presented at the hearing; (3) making its decision first and then making findings of fact to support that new result; (4) failing to adequately explain its departure from prior decisions; and (5) failing to comply with its statute and rule regarding changes to an ALJ=s findings of fact and conclusions of law. These issues have been discussed at length in *Flores* and we need not address each one individually. We reiterate that an agency must respect the due process rights of applicants who appear before it in contested cases.  *See Flores,* No. 03-01-00074-CV, slip op. at 6, at *9.  We sustain Mr. Langford=s second issue.

---

[7]     **The APA contains the minimum standards for administrative agencies.**  *See* Tex. Gov=t Code **Ann. ' 2001.001(1) (West 2000).  The Board stated that it was substituting its findings of fact and conclusions of law for those of the ALJ=s pursuant to the authority of its own statute and rules, specifically, section 815.511(a) of the Government Code and Rule 67.91 in the Administrative Code.**  *See* **Tex. Gov=t Code ' 815.511(a) (West Supp. 2002); 34 Tex. Admin. Code ' 67.91 (2001).  We will therefore specifically analyze the Board=s compliance under section 815.511(a) and Rule 67.91.**

## STATUTORY DEFINITION OF OCCUPATIONAL DISABILITY

In his third issue, Mr. Langford challenges the Board=s statutory definition of occupational disability.[8] We turn now to the first prong of that definition.

### ADirectly Results from a Specific Act or Occurrence@

At issue in this appeal, as in *Flores*, is the causal relationship that must be established between the traumatic incident (a specific act or occurrence determinable by a definite time and place) and resulting disability when the claimant also has preexisting conditions that contribute to the disability. In *Flores,* we affirmed the Board=s conclusion that the employee must prove that the at-work injury is the primary cause of his disability. *Flores*, No. 03-01-00074-CV, slip op. at 26-7, at *44-45. But we disapproved the Board=s additional rule that an employee must establish that an occupational trauma is the direct cause of his disability A*without regard to a preexisting mental or physical condition.*@ We noted that a traumatic injury often interacts with other factors to produce a disability and the plain language of the statute does not mandate that the disability claimant be free from all preexisting conditions, including age-related back degeneration. It does mandate, however, that when there are preexisting mental or physical conditions, the claimant must establish that the traumatic incident is the primary cause of the disability. On

---

[8] *See* Tex. Gov=t Code Ann. ' 2001.174(A), (D) (West 2000) (providing that a reviewing court shall reverse or remand the case Aif substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions@ violate a statutory provision or are affected by other error of law).

9

the other hand, if the medical evidence establishes that a preexisting condition is the primary cause of incapacity, the disability does not directly result from a specific act or occurrence determinable by a definite time and place.

The Board rejected the ALJ=s conclusion that Mr. Langford=s disability resulted from a specific occurrence determinable by a definite time and place, saying that the ALJ had misinterpreted and failed to apply the policy of the Board regarding preexisting conditions. The Board=s explanation for rejecting the ALJ=s conclusion stated that in accordance with its policy and its interpretation of the statute, Aa member has been required to present credible medical evidence that a specific occupational trauma is the direct cause of the member=s disability *without regard to a preexisting mental or physical condition.*@ (Employees Ret. Sys. of Tex., *Appeal of Calvin Langford=s Application for Occupational Disability Benefits*, Docket No. 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 (June 14, 2000) (order adopting proposed findings of fact and conclusion of law and denying application for benefit) (emphasis added)). The Board further explained that the ALJ, by relying on the Board=s earlier decisions that an age-related preexisting condition would not disqualify an applicant, impermissibly expanded the statutory definition of an occupational disability.

Under the definition announced in *Flores*, the Board could reject the ALJ=s conclusion that Mr. Langford=s disability directly resulted from a specific act or occurrence determinable by a definite time and place only if it concluded, and the evidence supported a conclusion, that his disability was primarily caused by a preexisting condition.

**The Medical Evidence**

10

Mr. Langford=s treating physician, Dr. Jerjis J. Denno, diagnosed him as having a lumbar herniated nucleus pulposus[9] with lumbar spinal stenosis.[10] Mr. Langford had preexisting degenerative conditions in his spine caused by the aging process, but these were mild to moderate in nature. In response to a deposition question inquiring as to any and all preexisting conditions, Dr. Denno indicated that Mr. Langford had Alumbar spondylosis with bulging discs,@ Aligamentum hypertrophy, facet hypertrophy,@ and Aspinal stenosis@ and that the spondylosis and spinal stenosis at the L4-5 vertebrae could make the herniated disc at L4-5 more symptomatic. Dr. Denno also noted that such degenerative conditions were normal for a man of Mr. Langford=s age (he was fifty-one at the time of his fall) and were part of a Anormal progressive condition (wear and tear of the spine).@ Dr. Denno further wrote in his notes after an office visit by Mr. Langford:

---

[9] Cartilagenous discs separate the vertebrae of the spinal column. *See* Merck Manual Home Edition online, AChapter 69, Spinal Cord Disorders, Rupture Disk@ (Apr. 18, 2002) <http://www.merckhomeedition.com/home.htm.> AEach disk has a strong outer layer and a softer inner part that acts as a shock absorber to cushion the vertebrae during movement. If the disk degenerates, for example following an injury or with aging, the inner part of the disk can bulge or rupture through the outer layer (herniated disk).@ *Id.*

[10] Spinal stenosis is a Anarrowing of the spinal canal, causing pressure on the sciatic nerve roots and occasionally on the cord.@ Merck Manual of Geriatrics online, AChapter 50, Nonmetabolic Bone Disease, Spinal Stenosis@ (Apr. 18, 2002) < http://www.merck.com/pubs/mm geriatrics/.>

> I explained to Mr. Langford that degeneration in the spine was a preexisting condition. *I do feel that the herniated disc in his lumbar spine at L4-5 was a direct result of the work-related injury of August 17, 1998.* Degeneration of lumbar discs is a fairly common finding in the adult population. It is usually asymptomatic and does not necessarily lead to a herniation. *It was Mr. Langford=s fall at work that led to the herniation of the disc in his lumbar spine.*

(Emphasis added.)

Similarly, in his response to a deposition question that asked whether Mr. Langford=s preexisting conditions caused his injuries following the slip-and-fall, Dr. Denno answered: ANo, the preexisting condition was aggravated by the work injury.@ Dr. Denno also stated that these preexisting conditions would not have prevented Mr. Langford from performing the normal duties of his job prior to the accident. Moreover, Dr. Denno found that the workplace accident would probably have been sufficient to permanently disable Mr. Langford even in the absence of the preexisting condition. Had the accident not occurred, Dr. Denno expected that Mr. Langford probably would have been able to continue in his job until he reached sixty-five years of age.

While the ERS staff disputed the causal relationship between Mr. Langford=s accident and his disability, it failed to present any evidence that would have controverted the evidence offered by Mr. Langford. The staff presented the statement by the Medical Board in its certification of Mr. Langford=s disability that Mr. Langford=s injury probably would *not* have been permanently disabling in the absence of the preexisting conditions. The Medical Board did not refer to the evidence on which it was basing its conclusion, nor do we find any evidence in the record that supports such a conclusion. The ALJ found that Mr Langford=s spinal degeneration *contributed* to his permanent

incapacity in that it made the traumatic injury more symptomatic and less treatable; the ALJ also found that the degeneration was caused only by the natural-aging process. Moreover, there is no finding that Mr. Langford=s preexisting condition *primarily* caused his disability. Indeed, the medical evidence in the record indicates that Mr. Langford=s preexisting spinal condition was mild to moderate.

The ERS staff also pointed to the opinion of the Medical Board that Mr. Langford=s obesity played a role in causing his disability. Although the Medical Board included Amorbid obesity@ among the causes of Mr. Langford=s incapacity, it did not refer to any specific evidence supporting the causal relationship between his weight and his disability. Moreover, in response to a specific question on the certification form inquiring as to whether the traumatic incident aggravated a preexisting condition, the Medical Board referred only to the degenerative disc condition. While there is a reference to Mr. Langford=s obesity in his medical records, there is no indication that Mr. Langford=s weight was a factor in causing his incapacity. Mr. Langford=s weight, then, could not have been the Aprimary cause@ of his disability.

The ALJ weighed the evidence presented by Mr. Langford, which included the testimony of his treating physician, against the conclusory statements offered by the agency. The ALJ specifically took note of this disparity in the evidence in his proposed decision:

> The ERS Medical Board found that Mr. Langford=s incapacity was caused by Aherniated lumbar disc, spinal stenosis, morbid obesity@ and that Adisc injury@ and spinal Adegenerative disease@ were preexisting at the time of Mr. Langford=s slip and fall. *The nature and extent of analysis performed by the board in reaching these conclusions (which were set out in the [medical] board=s formal certification on Mr. Langford=s application) is [sic] not indicated in the record.*

**13**

On the other hand, Mr. Langford=s treating physician, Jerjis J. Denno, M.D., an orthopedic surgeon, testified by written deposition that the immediate cause of Mr. Langford=s disability**C** *i.e.*, a herniated disc at the L4-5 level**C** resulted directly from the incident on August 17, 1998, and *would have occurred even in the absence of preexisting conditions.* Dr. Denno acknowledged that his patient exhibited degenerative conditions that predated the accident-including lumbar spondylosis with bulging discs, ligamentum hypertrophy, and facet hypertrophy at L2-3, L3-4, L4-5, and L5-S1 levels. *However, while these preexisting conditions made Mr. Langford=s herniated disc at L4-5 more symptomatic and difficult to treat than would otherwise have been the case, they did not directly cause the patient=s disabling injury and, by themselves, would not have prevented him from undertaking his normal job activities.*

(Emphasis added.)

On appeal, the Board found that the ALJ=s conclusion that Mr. Langford=s disability directly resulted from a specific act or occurrence determinable by a definite time and place **A**erroneously expands the definition of occupational disability to include a disability that is primarily caused by degeneration that is the result of the natural-aging process.**@**[11] We are unable to find the evidence that would support this conclusion. In fact, the only evidence in the record reflects that Mr. Langford was fully capable of performing his job duties prior to the traumatic slip-and-fall injury but was disabled after the injury.

The Board rejected the ALJ=s conclusion of law that Mr. Langford=s injury directly resulted from a specific act or occurrence determinable by a definite time and place. We hold that in rejecting this

---

[11] Employees Ret. Sys. of Tex., *Appeal of Calvin Langford=s Application for Occupational Disability Benefits*, Docket No. 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 (June 14, 2000) (order adopting proposed findings of fact and conclusion of law and denying application for benefit). The Board=s statement appears in its explanation immediately following its conclusion of law number four.

conclusion the Board erred first, because it erroneously applied its without-regard-to-preexisting-conditions rule that disqualified Mr. Langford because he had an asymptomatic back condition that was aggravated by his fall, and second, because it substituted its conclusion that Mr. Langford=s disability was primarily caused by his degenerative back disease, when the evidence does not support such a conclusion. We hold that the Board applied an erroneous interpretation of the statute in rejecting the ALJ=s conclusion that Mr. Langford=s disability directly resulted from a specific act or occurrence determinable by a definite time and place.

## ARISK OR HAZARD PECULIAR TO A DUTY@

The Board rejected the ALJ=s conclusion that Mr. Langford=s disability directly resulted from a risk or hazard peculiar to his duties of state employment on the ground that it was Abased on a misunderstanding or misinterpretation of Board policy, specifically, that the risk of slipping and falling is a common risk not peculiar to duties that arise from and in the course of state employment.@[12] We have held that the Board=s interpretation of this prong of the statute is inconsistent both with the statute and with our decision in *Bond v. Employees Retirement System*, 825 S.W.2d 804 (Tex. App.CAustin 1992, writ denied). *See Flores*, No. 03-01-00074-CV, slip op. at 32, at *52. In *Flores*, we rejected the Board=s position that for a risk or hazard to be peculiar to a duty of state employment, the duty must impose a risk or hazard that is somehow different from the risk assumed by other persons engaged in the same activity. *Id.* at 31, at *52. We clarified that a risk or hazard is peculiar to a duty if that duty

---

[12] *Id.* The Board=s statement appears in its explanation immediately following its conclusion of law number five.

imposes a risk or hazard different from the normal or usual risks encountered by a person *not* engaged in that duty. *Id.* at 31-2, at *52. Under the standard announced in *Flores*, the Board erred by rejecting the ALJ=s conclusion that Mr. Langford=s disability directly resulted from a risk or a hazard peculiar to his duties.

Mr. Langford was injured while performing his duties in the food service area of the Department of Criminal Justice where he was employed. The Department=s training manual addresses the need for sanitation in this institutional dining area: the floors are to be scrubbed with soap or other chemicals as often as necessary, at least daily.[13] Recognizing that frequent cleaning would enhance the hazard of slippery floors, the Department=s manual specifically instructs employees regarding the prevention of Aslips, trips, and falls@: AAvoid excessive water when cleaning floors; [b]e very careful when walking in the Food Service department, floors may be wet and slippery; [c]lean up spills immediately; [k]eep walkways clean, clear and free of debris; [w]alk safely.@ The manual also requires that Awet floor@ signs be posted immediately after cleaning and recommends that both employees and inmates working in the food service area wear non-skid shoes, such as rubber boots.

---

[13] The manual did not come out until a month after Mr. Langford=s accident; at the administrative hearing, however, Mr. Langford testified as to specific policies that were in force at the time of his injury and on which he had received training. These same policies were later incorporated into the manual.

All employee and inmate workers in the facility had to be careful to *avoid* the frequent

risk posed by wet floors. As a manager who supervised compliance with sanitation and safety

requirements, however, Mr. Langford routinely had to put himself in harm=s way by walking into wet

areas to perform his duties.[14] At the hearing, he testified that he had developed a way of walking

through the kitchen and dining facility by taking cautious Ahalf-steps@ to protect himself. When he

slipped and fell, Mr. Langford was wearing skid-resistant shoes and walking with this half-step gait

toward the inmate on duty to tell him to post a Awet floor@ sign. Thus, Mr. Langford=s accident was

precisely related to his unique duties as a food-service manager in the facility. We hold that there is

abundant evidence in the record that the risk of falling on slippery floors was peculiar to Mr.

Langford=s employment duties. The risk of falling imposed by his duties as a food service manager

working on constantly wet floors is different from the normal or usual risk of slipping and falling. The

ALJ so found in his findings of facts and in his PFD. We hold that the Board applied an erroneous

---

[14]     The ALJ eloquently described the inherent risk of slipping and falling on wet floors that Mr. Langford faced on the job:

> The requirements of Mr. Langford=s roving supervisory position, however, appear to have made him especially exposed to [the hazard of slippery floors]. In the process of monitoring the performance of food service workers (including, specifically, their compliance with sanitation and safety regulations), he was obliged to traverse frequently all parts of the large food preparation area. With the mopping up of random spills and the prescribed minimum daily scrubbing of all floors, Mr. Langford must have had to negotiate a constantly changing geography of slippery surfaces. But his job entailed not just the *avoidance* of these numerous and shifting wet areas; it often required him to move deliberately into such areas, as he did when he was injured, to assure that clean-ups were performed both effectively and with proper precautions. The difficulty of this task was undoubtedly increased by the inattentive, if not refractory, attitudes of some of the inmate workersBa circumstance that clearly contributed to the accident on August 17, 1998.

interpretation of the statute in reversing the ALJ=s conclusion of law that Mr. Langford=s injury directly resulted from an inherent risk or hazard peculiar to a duty arising from his state employment.

We sustain the third issue on appeal and hold that the Board applied an erroneous interpretation of both prongs of the statute in deciding Mr. Langford=s appeal.

## CONCLUSION

We hold that the Board acted arbitrarily and capriciously for the same reasons outlined in *Flores,* most notably by its disregard for the ALJ=s determination of the adjudicative facts.  For the reasons set out in our opinion in *Flores,* we hold that the Board applied an erroneous interpretation of the statute in rejecting the ALJ=s conclusions of law as to  both prongs of the definition of occupational disability.  Therefore, we reverse the district court=s judgment and the Board=s order and remand this cause to the Board for further proceedings consistent with this opinion.

Bea Ann Smith, Justice

Before Chief Justice Aboussie, Justices B. A. Smith and Puryear

Reversed and Remanded

Filed:   April 25, 2002

Publish

18