TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-05-00355-CV







Austin Chevrolet, Inc. d/b/a Munday Chevrolet/Geo and
General Motors Corporation, Appellants


v.



Motor Vehicle Board and Motor Vehicle Division of the Texas Department of
Transportation and Landmark Chevrolet Corporation, Appellees






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT


NO. GN500875, HONORABLE W. JEANNE MEURER, JUDGE PRESIDING







O P I N I O N




 This is an appeal from a final order issued by the Motor Vehicle Board of the Texas
Department of Transportation (1) in a Subaru proceeding. (2)
 See Subaru of Am., Inc. v. David McDavid
Nissan, Inc., 84 S.W.3d 212, 226 (Tex. 2002). In this case, Landmark Chevrolet Corporation
(Landmark) filed a lawsuit against General Motors Corporation (GM) and Austin Chevrolet, Inc.,
d/b/a Munday Chevrolet/Geo (Munday) (together "GM/Munday"), alleging that GM defrauded
Landmark out of its right to protest (3) Munday's dealership application in 1993 and discriminated
against Landmark in the allocation of Suburbans and Tahoes from 1994 to 1997. The district court
abated the suit and referred these two issues to the Board for determination. See Tex. Occ. Code
Ann. §§ 2301.151, .251-.266 (West 2004); Butnaru v. Ford Motor Co., 84 S.W.3d 198, 206 (Tex.
2002); Subaru, 84 S.W.3d at 223. After an administrative law judge (ALJ) conducted a hearing and
prepared a proposal for decision (PFD), the Board ruled for Landmark on the first issue and for
GM/Munday on the second issue.

 GM/Munday now appeal the issue decided in favor of Landmark, contending that the
Board acted in an arbitrary and capricious manner by refusing to answer the question posed by the
district court and by ignoring the Board's precedent. We affirm the Board's order.


FACTUAL AND PROCEDURAL BACKGROUND


 This appeal arises out of a dispute over the establishment and relocation of the
Munday dealership in the north Houston area. In 1993, Munday filed an application with the Board
for a new franchised motor vehicle dealer's license for a dealership to be located in northwest 
Houston, at F.M. 1960 and Cypress Station Drive, approximately one-half mile west of Interstate
Highway 45. This application was timely protested by Landmark, a large-volume dealership located
ten miles south of the proposed Munday location on Interstate Highway 45. GM intervened in the
protest proceeding on Munday's behalf. A pretrial conference was held, discovery conducted, and
a hearing on the merits was scheduled. Prior to the commencement of the hearing, Landmark
dismissed its protest of the Munday application after, it contends, it was assured that GM would give
consideration to Landmark's concerns about the proposed dealership. The Board then issued a
license to Munday. Soon after, Munday completed construction of the dealership and commenced
operations.

 In 1997, Munday filed an application with the Board to relocate the dealership directly
onto Interstate Highway 45. Landmark filed this lawsuit against GM/Munday, alleging, among other
things, that GM defrauded Landmark out of its right to protest Munday's 1993 application. 
Landmark alleged that GM was biased in the 1993 matter because GM had conditioned its offer of
the Chevrolet franchise to Munday on Munday's purchase, for above-market value, of the GM-owned property at F.M. 1960 and Cypress Station Drive.

 On motions filed by GM/Munday, the district court abated the suit and referred the
matter to the Board to answer the following question at issue in this appeal:


If Landmark had not withdrawn its protest of the license application at issue in
William F. Munday d/b/a Bill Munday Chevrolet/Geo, Applicant v. Landmark
Chevrolet Corp., Protestant and General Motors Corporation, Intervenor, before the
Texas Department of Transportation, Division of Motor Transportation; Docket No.
93-094, under § 4.06(c) of the Texas Motor Vehicle Commission Code, (4) would
Landmark have obtained a final order denying the license application? (5)



 This abatement was predicated upon decisions issued by the supreme court in Butnaru
and Subaru, wherein the court determined that the Board has the exclusive jurisdiction to determine
violations of the motor vehicle code. See Butnaru, 84 S.W.3d at 206; Subaru, 84 S.W.3d at 223. 
Following the district court's abatement, Landmark initiated a contested-case proceeding by filing
a complaint with the Board against GM/Munday so the Board could answer the district court's
question. The role of the Board in this matter was to interpret the code so that the district court could
determine if damages were to be assessed against GM/Munday. See Subaru, 84 S.W.3d at 224.

 In the contested-case proceeding, GM/Munday had the burden to show good cause
for the establishment of the new Munday dealership pursuant to § 2301.652(a) of the occupations
code, which states,


(a) The board may deny an application for a license to establish a dealership if,
following a protest, the applicant fails to establish good cause for establishing
the dealership. In determining good cause, the board shall consider:


 (1) whether the manufacturer or distributor of the same line-make of new
motor vehicle is being adequately represented as to sales and service;


 (2) whether the protesting franchised dealer representing the same line-make
of new motor vehicle is in substantial compliance with the dealer's
franchise to the extent that the franchise is not in conflict with this chapter;


 (3) the desirability of a competitive marketplace;


 (4) any harm to the protesting franchised dealer; and


 (5) the public interest.



See Tex. Occ. Code Ann. § 2301.652(a) (West 2004). The second factor was not in dispute; the
other four factors were contested.

 The Board found that GM/Munday failed to prove good cause for the addition of the
Munday dealership. As a result, the Board found that if Landmark had not withdrawn its protest of
Munday's license application in 1993, its protest would have been granted and Munday's application
would have been denied. GM/Munday filed an administrative appeal in district court and Landmark
removed the appeal to this Court pursuant to section 2301.751(b) of the occupations code. See id.
§ 2301.751(b) (West 2004).


ANALYSIS


The Controversy

 GM/Munday contend that after the parties had agreed to refer the question to the
Board, the Board improperly recast the question. GM/Munday further contend that the Board
improperly excluded evidence, specifically the testimony of the former executive director of the
Board, which it sought to proffer. GM/Munday also argue that, in analyzing the statutory good-cause
factors on harm and adequacy of representation, the Board abandoned precedent and penalized
GM/Munday for using a previously approved standard, thus violating their due process and equal
protection rights.

 Landmark and the Board respond that the Board properly conducted the proceedings
and that its decision was supported by substantial evidence.


Standard of Review

 We review the Board's decision under the substantial-evidence standard. Tex. Occ.
Code Ann. § 2301.751(a); see Tex. Gov't Code Ann. § 2001.174 (West 2000); Subaru, 84 S.W.3d
at 224. "'Broadly speaking, the substantial evidence rule is a court review device to keep the courts
out of the business of administering regulatory statutes enacted by the Legislature; but it remains the
business of the courts to see that justice is administered to competing parties by governmental
agencies.'" Board of Regents v. Martine, 607 S.W.2d 638, 641 (Tex. Civ. App.--Austin 1980, writ
ref'd n.r.e.) (quoting Lewis v. Metropolitan Savs. and Loan Ass'n, 550 S.W.2d 11, 13 (Tex. 1977)).

 Under a substantial-evidence review, we presume that the Board's order is supported
by substantial evidence, and the appellant has the burden of overcoming this presumption. Graff
Chevrolet Co., Inc. v. Texas Motor Vehicle Bd., 60 S.W.3d 154, 159 (Tex. App.--Austin 2001, pet.
denied). When a court is applying the substantial-evidence standard of review to an agency decision,
the issue for the reviewing court is not whether the agency's decision was correct, but whether the
record demonstrates some reasonable basis for the agency's action. Central Power & Light Co. v.
Public Util. Comm'n, 36 S.W.3d 547, 561 (Tex. App.--Austin 2000, pet. denied). We may not
substitute our judgment for that of the agency on matters committed to agency discretion. Tex.
Gov't Code Ann. § 2001.174; H.G. Sledge, Inc. v. Prospective Inv. & Trading Co., Ltd., 36 S.W.3d
597, 602 (Tex. App.--Austin 2000, pet. denied). The agency is the sole judge of the weight of the
evidence and the credibility of the witnesses. Central Power & Light, 36 S.W.3d at 561.


District Court's Question

 In its first and second issues, GM/Munday contend that the Board improperly recast
the district court's issue as "what would have happened had it taken the parties to 2002 to get to
hearing, but with evidence of market data beyond 1993 excluded?" GM/Munday assert that by
recasting the case in this manner, and by excluding the testimony of the former executive director
of the Board in 1993, the Board "engaged in an irrelevant thought experiment" that failed to answer
the question posed by the district court.

 We disagree. In this case, the district court's order did not instruct the Board on
methodology; rather, it properly deferred to the Board's authority and expertise in determining
whether there was good cause to add the Munday dealership in 1993. In deferring to the Board, the
district court followed the guidance of the supreme court in Subaru. See Subaru, 84 S.W.3d at 221. 

 In Subaru, the court stated, "Trial courts should allow an administrative agency to
initially decide an issue when: (1) an agency is typically staffed with experts trained in handling the
complex problems in the agency's purview; and (2) great benefit is derived from an agency's
uniformly interpreting its laws, rules, and regulations . . . ." Id. In the district court's order, it sought
the Board's "special competence, expertise and experience" in interpreting and applying the code
to cases involving the proposed addition of a dealership to a market. The order recognized that the
Board and its staff regularly deal with the questions raised in the issue in their administration of
protest proceedings, and that the Board had developed rules for determining such issues, had
expertise in applying those rules, and had made prior decisions on applications for the addition of
a dealership into a market. 

 GM/Munday contend that the proper way to answer this question was to determine
how Board members sitting at that time would have ruled after considering the evidence and
witnesses that would have been presented in 1993. We disagree. The inquiry proposed by
GM/Munday would have been beyond the Board's jurisdiction because it is not authorized by the
former motor vehicle commission code or the occupations code. Furthermore, although the Board
has expertise and experience in making the good cause determination in protest proceedings and has
developed rules and procedures for these proceedings, it has no expertise, experience, or rules
relevant to a determination of how Board members sitting in the past would have reasoned or ruled,
or in determining what evidence, witnesses, and theories the parties might have proffered in a past
proceeding.

 GM/Munday ask the Board to conduct an impossible task, one that it admitted in its
pleadings was "too speculative for the Board to definitively answer." If the Board were to have
chosen this path, it would have had to resolve many complicating factors. For example, discovery
was never completed in the 1993 proceeding, several of the listed experts had not prepared reports
when Landmark withdrew its protest, and it is impossible to know when the PFD would have been
completed in an effort to determine who would have been on the Board at the time of its
consideration. Even if all these complications could be resolved, the final determination would still,
in the words of the Board, "inescapably require speculation concerning the subjective mental
perceptions of past Board members."

 Neither the supreme court in Subaru nor the district court here contemplated that the
Board would make a determination for which it had no relevant expertise, experience, or rules, nor
does the former motor vehicle commission code or the occupations code authorize it. Rather, the
district court followed the rationale and language of Subaru by asking the current Board to use its
authority and expertise, within the Board's sound discretion, to apply the statutory factors and
determine whether there was good cause to add the Munday dealership in 1993. (6) See id. 


Evidentiary Rulings

 In accord with its position that the current Board must step into the shoes of the 1993
Board, GM/Munday contend that the Board erroneously excluded the testimony of Russell Harding,
Executive Director of the Motor Vehicle Division from 1975 to 1993, who was prepared to testify
that "it was highly unlikely" that Landmark's 1993 protest would have prevailed before the Board
as composed in 1993. 

 We review an agency's rulings on the admission or exclusion of evidence under the
abuse of discretion standard we apply to trial courts. City of Amarillo v. Railroad Comm'n, 894
S.W.2d 491, 495 (Tex. App.--Austin 1995, writ denied). Specifically, the Board has broad
discretion in deciding whether to admit expert testimony in an administrative hearing, and its
decision will not be disturbed absent an abuse of discretion. See Fay-Ray Corp. v. Texas Alcoholic
Bev. Comm'n, 959 S.W.2d 362, 367 (Tex. App.--Austin 1998, no pet.). Because the legislature
gave the Board exclusive jurisdiction to determine the issue of good cause, based on its expertise and
experience in making this determination, it was, as a matter of law, uniquely and exclusively
qualified to make that determination in this case. The question of how best to resolve the issue was
a matter for the Board's discretion, and it did not abuse its discretion when it concluded that
Harding's testimony was irrelevant to this inquiry. We conclude that the Board acted within its
discretion when it rejected Harding's proposed testimony.

 GM/Munday further argue that the Board's exclusion of post-1993 market data was
error. However, post-1993 market data is irrelevant to a determination of whether good cause
existed to add the Munday dealership in 1993. To be sure, post-1993 market data would be
irrelevant to GM/Munday's preferred determination--how the Board sitting in 1993 would have
ruled. In any event, agencies are afforded broad discretion in admitting and excluding evidence, and
it was within the Board's discretion to limit the evidence in this case as it did.

 We overrule GM/Munday's first and second issues.


Harm

 In demonstrating good cause for the establishment of a new dealership, GM/Munday
were required to show that the Munday dealership would not "harm" the protesting franchised dealer. 
GM/Munday contend that the Board's finding of harm to Landmark based on a lessening of profits
is inconsistent with previous Board precedent equating harm with "demise, threatened viability, or
significant harm." GM/Munday further contend that there is no evidence of any decrease in sales
by Landmark.

 The Board has addressed harm to protesting dealers where, as here, there is no
showing of lost opportunity in any significant quantity beyond that which is already being captured
by the existing dealer body. In Lewisville Cycle Center v. Action Imports and Z Yamaha, the Board
stated, "In evaluating the potential effects of the granting of the application upon the Protestants, it
must again be pointed out that there has been no showing of any inadequacy of representation of
Yamaha." See Texas Dep't of Transp., Lewisville Cycle Center v. Action Imports and Z Yamaha,
Proc. No. 247, 1, 32 (Motor Vehicle Bd. Aug. 26, 1982) (final order). The Board continued, 


Without some showing that there is an existing untapped market potential available
in the Lewisville area which can serve the Applicant and the Protestants without
eroding the Protestants' existing market, it is not reasonable to conclude that the
granting of the application will not be harmful to the Protestants and therefore the
approval of the application would not be in the public interest. (7)



Id. at 33.

 In the instant case, GM/Munday failed to prove that there was a significant amount
of lost opportunity beyond that which was already being captured by the existing dealer body. The
Board found a level of opportunity so low that Munday's options, upon entry into the Houston
market, were limited to "cannibalization of its closest intrabrand competitors in order to merely
survive." As a "high-cost, high-volume dealer," the evidence showed that Landmark's new car sales
department had operated at a loss even during its best years, and it had relied on its used car, service,
parts and body shop business to maintain its profitability. The Board found that adding Munday to
this market in 1993 would have decreased Landmark's low profitability across all departments, and
caused it and other dealerships in the market to change their operations in a way that would have
resulted in poorer service to the public. The Board further predicted that the addition of Munday to
the dealer body in Houston, where sufficient opportunity had not been verified, was likely to have
ramifications in all corners of the market, as "dealership operational strategies are altered to the
public's detriment in an effort to regain or retain profit."

 The Board also found, consistent with precedent, that existing dealers in a market
with little to no opportunity should not be forced to reduce service to the public for the benefit of a
new dealer. See, e.g., Texas Dep't of Transp., Bill Munday Pontiac, Inc. v. Hendrix GMC Trucks,
Inc., et. al., Docket No. 80-213, 1, 22 (Motor Vehicle Bd. March 13, 1981) (final order) (if the
probable result of the establishment of an additional dealer in the Austin market would be the failure
of an existing dealer or the reduction of service to the public, then it would not be in the public
interest for the Commission to approve the application); Texas Dep't of Transp., Hudiberg
Chevrolet, Inc. v. Frontier GMC, Inc., et. al., Docket No. 80-193, 1, 40 (Jan. 8, 1981) (final order)
(it would not be in the public interest for the Commission to approve the application if it results in
the demise or failure of one or both of the dealerships or reduction of service to the public). 

 GM/Munday cite Board decisions that stand for the proposition that an existing dealer
in a flourishing market is not necessarily harmed because it must share the market with a new dealer,
even if it means that the existing dealer will profit less after the dealer network expands. See, e.g.,
Texas Dep't of Transp., Marathon Corp. v. American Kawasaki of Garland, Inc., Docket No. 93-159, 1, 20 (Sept. 29, 1994) (final order); Texas Dep't of Transp., Gene Harmon Ford, Inc. v. David
McDavid Nissan, Docket No. 96-151, 1, 22 (Sept. 18, 1997) (final order). Here the Board agreed,
stating that if Landmark had been in a flourishing market, the Board would expect Landmark to have
adjusted its business strategy to capture untapped opportunity in the market. But this was not the
case in 1993.

 Furthermore, we disagree with GM/Munday's contention that there is no evidence
of any decrease in sales on the part of Landmark. Landmark's expert, Dr. Ernest Manuel, testified
in his report that if Munday had been in existence in 1992, the most recent year available for the
purposes of this suit, "Landmark's new retail Chevrolet sales would have been from 15 percent to
30 percent lower than they actually were." Dr. Manuel also testified that if Munday were added,
Landmark's future sales would be 15% to 30% lower than what they would have been had Munday
not been present.

 GM/Munday contend that Dr. Manuel's testimony regarding Landmark's future sales
is insufficient to prove harm because it proves only that Landmark would have been deprived of
increased profits if Munday had been added to the dealer base. We disagree. Dr. Manuel forecast
an absolute decline in Landmark's future sales had Munday been added to the market as it existed
in 1993. 

 Landmark elicited testimony that in 1993 the Houston economy and auto market were
suffering from an extended decline. Landmark presented the expert report of Dr. M. Ray Perryman
that described the state of the economy in the Houston area at the end of 1992 as "sluggish and
stagnant." The report further stated that the overriding climate in the Houston area during this period
was one of "unemployment and job insecurity," as the unemployment rate in Houston in 1992
reached 7.4%, double the rate in 1980, and the city faced a corresponding decline in the real wages
of workers and increase in personal bankruptcy filings. According to the report, new automobile
sales, as represented by retail registration data, exhibited a pattern similar to the employment figures. 
New automobile sales in Houston in 1992 were 20.7% below the sales level in 1984, and new
automobile sales in the north Houston area declined in 1991 and 1992. The report concluded that
the market was characterized by "a decade of sluggishness, a declining trend in new automobile
sales, stagnant wages, substantial layoffs, and only modest growth projections."

 Within the context of the sluggish Houston market in 1992, Dr. Manuel testified, "if
the [automobile] market were flat or only increasing slightly, then you could have an absolute
decline, but if the automobile market is expanding at a rapid rate . . . then we would be looking at
a reduction in what Landmark sales would have been otherwise." In other words, Dr. Manuel
forecast an absolute decline in future sales by Landmark if Munday was added to the market
described in Dr. Perryman's report. Dr. Manuel concluded that a market "did not exist" for
Munday's 2,000-plus unit planned new vehicle volume and that the public interest would not have
been served by adding Munday's redundant facilities and capital.

 Because the Board's holding is consistent with its previous decisions and its
statutory duty to consider "any harm to the protesting franchise dealer," see Tex. Occ. Code Ann.
§ 2301.652(4) (emphasis added), we overrule GM/Munday's third issue.


Adequacy of Representation

 GM/Munday contend that the Board acted arbitrarily when it failed to follow its
precedent by rejecting the Texas average adjusted ("TAA") standard for measuring "adequacy of
representation" in the Houston market. See Tex. Occ. Code Ann. § 2301.652(1). GM/Munday assert
that it relied upon this standard in presenting its case on the issue of adequacy of representation, and
that, without notice, the Board decided that the standard was flawed and that GM/Munday had not
proven their case. The Board responds that the application of a different standard--the Texas
multiple dealer area (MDA) standard--was consistent with its precedents, within its discretion, and
more appropriate to the Houston market.

 The Board has not committed itself to the use of a single standard and has used a
variety of standards in its decisions. The standard employed by the Board varies based on the facts
and circumstances in each case. See, e.g., Texas Dep't of Transp., John Roberts BMW, Inc. v.
Classic Cars, Inc., Proc. No. 169, 1, 14 (Motor Vehicle Bd. Sept. 18, 1979) (final order) (BMW
national average and top fifteen metropolitan markets average); Texas Dep't of Transp., Burns
Motors v. Ed Payne Motors, Inc., Docket No. 00-0001 LIC, 1, 31 (Motor Vehicle Bd. Oct. 18, 2001)
(final order) (national and zone averages). GM/Munday acknowledged the Board's use of more than
one standard in their motion to the Board for rehearing, which stated, "The Board has never said that
any one average or statistical approach must be used," and GM has presented evidence comparing
different standards in prior cases before the Board. In recommending a standard in Jupiter
Chevrolet-Geo, Inc. v. Young Chevrolet, GM, through the same expert that testified before the Board
in the instant case, James Anderson, presented a comparison of the Dallas MDA standard, the Texas
standard, the national standard and adjusted versions of the latter two. See Texas Dep't of Transp.,
Jupiter Chevrolet-Geo, Inc. v. Young Chevrolet, Docket No. 93-130, 1, 17 (Motor Vehicle Bd. Aug.
15, 1994) (final order). In the instant case, Anderson considered and compared two different
standards, the national standard and Texas average standard. After considering both standards,
Anderson selected the TAA standard, which is the Texas average standard "adjusted for local
Houston area consumer preferences."

 We disagree that GM/Munday should have been able to rely on the Board's use of
the TAA standard alone. GM/Munday knew from previous decisions that the Board's choice of
standard was varied, and its own expert's report and testimony show that it prepared its case
accordingly. Additionally, because GM/Munday and Landmark exchanged expert reports and
exhibits and deposed each other's experts prior to trial, GM/Munday had notice that Landmark
would attack the TAA standard and propose a different standard to the Board. As a result,
GM/Munday's contention that, "without notice, the Board suddenly decided that the standard was
flawed" has no merit.

 Furthermore, the Board did not determine that the TAA standard was flawed in all
cases. It determined, based on the evidence presented at the hearing, that Landmark's standard was
more appropriate to calculate adequacy of representation on the facts of this case. 

 The Board described Landmark's attack on Anderson's methodology as "scathing,"
and recounted an "all-out war over the appropriate method by which to gauge adequacy of
representation." Although the Board had accepted Anderson's methodology before, on different
evidence from a different market, see Texas Dep't of Transp., North Arlington Auto. Co., d/b/a
Performance Chevrolet, v. Graff Chevrolet Co. and General Motors Corp., Docket No. 97-777, 1,
15 (Motor Vehicle Bd. Sept. 9, 1999) (final order), it noted that "the evidence and argument offered
by Landmark and highlighting significant problems with Mr. Anderson's methodology [had not
been] readily apparent . . . in past cases before the Board." The Board added that, in this case,
Landmark had brought forth a plausible alternative to Anderson's standard.

 Landmark attacked the applicability of the TAA standard to the Houston market as
it existed in 1993 by proving that it was fundamentally dissimilar to the vast majority of the markets
used in creating the TAA standard. Landmark, through its expert, Dr. Manuel, adduced evidence
that 249 of the 259 Chevrolet markets in Texas used by Anderson to calculate Chevrolet's expected
market penetration were single dealer areas (SDAs), while only ten were MDAs. The Board found
that Chevrolet dealers in SDAs have a "big advantage" over Chevrolet dealers in MDAs because
they are not required to compete within their areas of primary responsibility with other Chevrolet
dealers and do not have the same level of competition from interbrand competitors. As a result, the
Board found that the expected penetration rate for Chevrolet dealers in SDAs are, "as a rule, higher
than those of Chevrolet dealers in fiercely competitive MDAs." The Board concluded that it could
not "endorse a process that characterizes a market as 'underperforming' simply because it fails to
meet a standard so profoundly influenced by markets bearing so little resemblance to the market in
question."

 Landmark further attacked the TAA standard by targeting Anderson's "segmentation
analysis," by which he adjusted the Texas average to account for differences in consumer preferences
and product mix from market to market. Landmark disputed that segmentation was capable of
refining the TAA standard to account for the profound differences between MDAs and SDAs. In
addition to the evidence already discussed, Landmark adduced evidence that people who live in
MDAs have a preference for imported automobiles, showing that manufacturers of Asian
automobiles alone made 40% of all retail sales in the Houston MDA in 1992. Landmark argued that
the TAA was further skewed by the fact that it is dominated by markets where imports are not readily
available, showing that 61% of the import dealerships in Texas are located in the 10 MDAs. 
Additionally, Landmark adduced testimony that product preference contributes to the higher
Chevrolet penetration in SDAs, specifically because of the popularity of trucks in SDAs and
Chevrolet's relative strength in that market. Landmark also adduced testimony showing an inverse
relationship between high household income and propensity to buy a Chevrolet, and showed that
household income in SDAs was 40% lower than in MDAs. In light of this evidence, the Board
agreed that Anderson's segmentation analysis did not "sufficiently account for all measurable
differences."

 Despite Landmark's "scathing" attack on the TAA standard and Anderson's
methodology, the Board recounted "a refusal by GM to address, head-on, any shortcomings in the
Texas standard that motivated Landmark to offer an alternative standard in the first place." 
Additionally, by not providing any evidence based on the Texas MDA standard, GM/Munday took
the calculated risk that if the Board accepted that standard, it would be left with no evidence. The
Board's order noted that "Munday and GM have given the ALJ precious little reason to reject the
Texas MDA standard out of hand." 

 In sum, the Board did not find the TAA standard to be per se unreasonable. Instead,
based on the evidence presented and the facts of this case, the Board found that the record did not
support a finding that the TAA standard was "a useful tool for accurately gauging Chevrolet's
performance in the Houston MDA." Further, the Board found the Texas MDA standard to be
appropriate because it did not "unfairly raise the expected average for the Houston MDA by
including in its calculation the routinely higher expected averages enjoyed by SDA markets," and
conservative because "it included in its calculation markets that are both adequately and inadequately
represented." We find that the Board's use of the Texas MDA standard was supported by the
evidence and within the Board's discretion.

 The Board found that a comparison of Chevrolet's performance in the Houston MDA
to any of the standards, including the TAA proposed by GM/Munday, "failed to confirm a sufficient
amount of shortfall to justify a finding in respondent's favor on the issue of adequacy of
representation." As the Board noted, even using the TAA standard, the registration shortfall in the
entire Houston MDA in 1992 was only 1,173 units, a figure that decreased even further to 549 units
in 1993. These figures were far below the 1,200 to 1,500-unit break-even point and the 2,296-unit
planned potential for the proposed Munday dealership.

 GM/Munday respond that the Board's numbers are inaccurate because it failed to
properly consider gross loss and insell. However, the Board dismissed GM/Munday's gross loss
figure, determined by GM/Munday by adding together the shortfall in each census track that did not
meet the expected penetration based on the TAA standard, because of its reliance on the flawed TAA
standard. The Board dismissed GM/Munday's insell figure, which is the number of units registered
in the Houston MDA that were sold by Chevrolet dealers outside of the Houston MDA, because it
did not adequately consider the marketing advantages enjoyed by dealers on the geographical fringes
of the Houston market. The Board found that there was insufficient evidence in the record to support
a finding that Munday was capable of capturing insell from fringe dealers, who have been able to
successfully communicate to Houstonians that they sell their products at lower prices than their
MDA competitors.

 The Board found that GM/Munday's calculation of gross loss and insell were further
skewed because GM/Munday relied on figures from the entire MDA, without regard to the amount
of gross loss or insell available to Munday within a twenty-mile radius from its location, a distance
beyond which a dealer's chance of contributing to its brand's market share was considered remote
by the Board. The Board noted that GM/Munday failed to provide enough information to properly
calculate gross loss or insell based on a more reasonable standard and distance.


Due Process and Equal Protection

 As part of its fourth issue, GM/Munday contend that its equal protection and due
process rights were violated when the Board deviated from prior announced standards without
notice. See U.S. Const. amend. XIV, § 1 (equal protection, due process); Tex. Const. art. I, §§ 3, 19
(equal protection, due process). Specifically, GM/Munday contend that the Board acted in an
arbitrary and capricious manner when the Board rejected GM/Munday's use of the TAA standard,
and the data derived therefrom, and applied a different and new standard "after the hearing" and
without explanation.

 In administrative proceedings, due process requires that parties be accorded a full and
fair hearing on disputed fact issues. Office of Pub. Util. Counsel v. Public Util. Comm'n, 185
S.W.3d 555, 576 (Tex. App.--Austin 2006, pet. filed). At a minimum, it requires that the
"rudiments of fair play" be observed. Id.; State v. Crank, 666 S.W.2d 91, 94 (Tex. 1984). Although
the strict rules applicable to courts do not apply to agencies, agencies cannot be arbitrary or
inherently unfair. Office of Pub. Util. Counsel, 185 S.W.3d at 576. Furthermore, a licensing
authority acts arbitrarily and unlawfully if it treats similarly situated applicants differently without
an articulated justification. BMW of N. Am. v. Motor Vehicle Bd., 115 S.W.3d 722, 726 (Tex.
App.--Austin 2003, pet. denied). 

 As previously discussed, the Board applied established standards in this case and did
not create new rules or policies after the hearing. Because GM/Munday were given notice during
pre-trial discovery of the standards Landmark would employ to measure harm and adequacy of
representation, there was no surprise to GM/Munday or lack of opportunity to introduce
contravening evidence. Furthermore, the Board fully explained its decisions regarding adequacy of
representation and harm and did not act in an arbitrary or capricious manner.

 The cases cited by GM/Munday do not hold otherwise. GM/Munday cite Flores v.
Employers Retirement System of Texas, 74 S.W.3d 532, 533-34 (Tex. App.--Austin 2003, pet.
denied), and Madden v. Texas Board of Chiropractic Examiners, 663 S.W.2d 622, 627 (Tex.
App.--Austin 1983, writ ref'd n.r.e.), cases in which this Court determined that it was improper for
an agency to retroactively apply a newly created rule or policy.

 In Flores we stated, "an agency is not bound to follow its decisions in contested cases
in the same way that a court is bound by precedent." Flores, 74 S.W.3d at 544. We added, however,
that an agency is required by courts to "explain its reasoning when it 'appears to the reviewing court
that an agency has departed from its earlier administrative policy or there exists an apparent
inconsistency in agency determinations.'" Id. at 544-45. After acknowledging that it had previously
accepted Anderson's methodology on adequacy of representation, the Board explained why it was
trumped in the instant case by the evidence and argument offered by Landmark, which did not inflate
the expectations for the Houston market. Regarding harm, the Board acknowledged its prior
decisions and distinguished the instant case, finding that GM/Munday failed to provide sufficient
evidence of lost opportunity beyond that which was already being captured by the existing dealer
body.

 It necessarily follows and we hold that the Board did not create a new policy or rule. 
The Board determined, based on the evidence presented during the hearing process, that Landmark
had the more convincing experts and more appropriate methodology to evaluate the statutory good
cause factors for the Houston market during the time in question. 

 GM/Munday also cite Starr County v. Starr Industrial Services, Inc., in which this
Court determined that it was arbitrary and capricious for an agency to consider, after the hearing, a
factor outside the statutory criteria. 584 S.W.2d 352, 356 (Tex. Civ. App.--Austin 1977, writ ref'd
n.r.e.). But in the instant case, the Board did not add any new criteria to the statutory good cause
factors.

 Accordingly, we overrule GM/Munday's fourth issue.


CONCLUSION


 Because we find that the Board did not act in an arbitrary or capricious manner and
its order is supported by substantial evidence, we affirm the Board's order.



 __________________________________________

 Jan P. Patterson, Justice

Before Chief Justice Law, Justices Patterson and Pemberton

Affirmed

Filed: June 9, 2006

1. The Board was abolished in 2005. See Act of May 30, 2005, 79th Leg., R.S., ch. 281,
§ 7.01, sec. 2301.002(2), (10), 2005 Tex. Gen. Laws 778, 839. We will, however, continue to refer
to the Board as it issued the order under review. The Motor Vehicle Division of the Texas
Department of Transportation is now headed by a division director. See id.
2. A Subaru proceeding is required when a party files suit in district court, but includes claims
within the Board's exclusive jurisdiction under the Texas Occupations Code as issues to be decided
in the lawsuit. As the supreme court concluded in Subaru, the district court lacks jurisdiction to
consider code-based claims falling within the Board's exclusive jurisdiction and should abate the
trial proceedings to allow this jurisdictional defect to be cured by presenting those claims to the
Board for review and final decision. Subaru of Am., Inc. v. David McDavid Nissan, Inc., 84 S.W.3d
212, 227-28 (Tex. 2002). Once the Board renders a final decision on the code-based claims, the
parties may then utilize the Board's findings for purposes of the lawsuit. Id. at 228.

3. A new car dealer may protest a manufacturer's decision to establish a new car dealership
of the same line-make within a fifteen-mile radius of the existing dealership. See Tex. Occ. Code
Ann. § 2301.652(b)(2) (West 2004).
4. The former Texas Motor Vehicle Commission Code, the Board's enabling statute, was
codified at Chapter 2301 of the Texas Occupations Code, effective on June 1, 2003. See Act of May
22, 2001, 77th Leg., R.S., ch. 1421, § 5, sec. 2301, 2001 Tex. Gen. Laws 2570, 4921-68. The Board
order under review involved the "protest" provision in the 1993 version of the Motor Vehicle
Commission Code. Although codification altered the numbering system, the relevant portions of
the protest provision have not changed. We will refer to the current code provisions, unless
otherwise stated.
5. The district court referred a second question to the Board, but that question is not at issue
in this appeal.
6. We do not address the district court's consideration of the Board's order in the pending
lawsuit.
7. Until 1989, the protest section did not include harm to the protesting dealer as a separate
factor to be considered in protest proceedings. Instead, it considered harm as an aspect of "public
interest." See, e.g., Texas Dep't of Transp., Voltex Corp d/b/a Nils Sefeldt Volvo v. Barney Garver
Motors and Mazda Motors of Am., Inc., Proc. No. 126, 1, 25-26 (Motor Vehicle Bd. July 5, 1978)
(final order). This section was amended in 1989 to state that the "Board shall consider . . . any harm
to the protesting franchise dealer." See Tex. Occ. Code Ann. § 2301.652(4) (emphasis added).